This is a wrongful death medical malpractice action. The plaintiff appeals from a judgment entered on a jury verdict in favor of the defendant physician.[1] We reverse and remand.
The case arose from these facts:
At 8:15 p.m., Wednesday, November 28, 1979, Cornelia Thompson was taken to the St. Margaret's Hospital emergency room in Montgomery, complaining of severe lower abdominal pain, fever and chills, and discomfort in urinating. She was examined by Dr. S.E. Jarrell, the defendant herein. Dr. Jarrell diagnosed Mrs. Thompson's condition as a lower urinary tract infection, known as cystitis, and prescribed an antibiotic. He instructed Mrs. Thompson to have her urine rechecked in six days, and at 10:55 p.m. allowed her to go home.
Mrs. Thompson did not begin taking the medication until Thursday morning, according to testimony by her husband, Lloyd C. Thompson, because at the time of her release from the emergency room, there were no pharmacies open. Mrs. Thompson continued to experience pain and discomfort and later that day called the hospital. According to her husband, Mrs. Thompson was told by someone at the hospital to give the medication time to take effect.
Mrs. Thompson continued to take the medication the next day, Friday, November 30, and there is conflicting testimony as to whether she felt better that day. That evening, Mrs. Thompson went to bed after taking her medication and the next morning was found dead in bed.
An autopsy was performed which determined the cause of death to be acute pyelonephritis, a kidney infection.
Dr. Allan Jay Kogan, a physician who specializes in emergency room medicine, testified that, in his opinion, Dr. Jarrell negligently failed to diagnose the kidney infection. According to Dr. Kogan, had the condition been treated in time, Mrs. Thompson's death could have been prevented.
The autopsy also revealed the presence of various central nervous system depressant drugs in Mrs. Thompson's body, including 196 mg. of diazepam (valium) in her stomach, ethchlorvynol (placidyl) in her urine, and codeine from Tylenol #3 tablets *Page 150 
prescribed by Dr. Jarrell for pain. Dr. Kogan testified that the large amount of diazepam in the stomach could have been caused by an intestinal blockage which prevented the drug, which Mrs. Thompson had been taking over a period of time, from entering the intestine.
Dr. John Emory Campbell, an expert who testified in behalf of Dr. Jarrell, testified over objection that, in his opinion, Mrs. Thompson died not from a kidney infection but from a voluntary drug overdose. According to Dr. Campbell, when depressants like those found in Mrs. Thompson's body are taken together, the risk of overdose is greatly increased.
In addition to his testimony concerning drugs found in Mrs. Thompson's body, Dr. Campbell was allowed to describe the properties of drugs found in Mrs. Thompson's kitchen cabinet. With respect to chloral hydrate, a drug found in the kitchen cabinet, but not tested for in Mrs. Thompson's body, Dr. Campbell stated:
 "All right. Chloral hydrate is a drug that's commonly used as a sleeping pill. It's a very old medication; been used for many, many years. It's the old knockout drops they used to mix with alcohol. It has a rapid onset of action. It causes deep coma in overdose. And it has been known to cause death after as few as eight capsules in an adult."
At the conclusion of his testimony concerning drugs found in Mrs. Thompson's body and in the kitchen cabinet, Dr. Campbell responded to the following question:
 "Q. Dr. Campbell, based on your training in pharmacology in undergraduate school and in pharmacy with a pharmacy degree from Auburn University, your training in medical school including a course in pharmacology, based on your experience as a Board member of the Alabama Poison Control Council, based on your experience in treating — well, let me ask you this: Do you have occasion to treat drug overdoses on a regular basis in the course of your duties as an emergency room physician?
"A. Yes.
 "Q. And based on that experience of regularly dealing with drug overdose cases, do you have an opinion as to the cause of death in Mrs. Thompson's case?
"A. Yes.
"MR. TAYLOR: We object.
"Q. What is that opinion?
"MR. MORROW: Your Honor, we object.
"THE COURT: Overruled.
 "MR. MORROW: May I state my grounds, for the record?
"THE COURT: Yes.
 "MR. MORROW: For the record, that's not a proper hypothetical. It doesn't set forth the facts upon which you could base that determination. There has been no predicate laid [that] [t]his man performs autopsies, no predicate that he has done any of the tests in this particular report he has been examining. There is no sign that he has any experience or expertise upon which to base such an opinion.
"THE COURT: Overruled.
"Q. What is your opinion, Dr. Campbell?
"A. That she died of a voluntary drug overdose.
"Q. A voluntary drug overdose?
"A. Yes."
The trial court erred in overruling the objection to this question. There was simply no predicate laid for the admission of this expert's testimony.
Our cases are consistent in holding that an expert witness may give opinion testimony based upon either facts of which he has personal knowledge or facts which are assumed in a hypothetical question. Alabama Power Co. v. Robinson,447 So.2d 148 (Ala. 1983), reh'g denied; Yates v. Christian BenevolentFuneral Homes, Inc., 356 So.2d 135 (Ala. 1978). See, C. Gamble,McElroy's Alabama Evidence § 130.01 (3d ed. 1977). In either event, "the facts known to the expert or hypothe[sized] must be facts in evidence." Hagler v. Gilliland, 292 Ala. 262, 265,292 So.2d 647 (1974). *Page 151 
The defendant argues that Dr. Campbell had personal knowledge of the "data" in this case, based on his review of medical reports regarding Mrs. Thompson, all of which were in evidence prior to his testimony. Although it is not clear from the record that Dr. Campbell's observation of the evidence in this case constitutes personal knowledge, as contemplated by our decisions,[2] we note that he did not state the facts on which his opinion was based. Nor was the question predicated upon stated hypothetical facts.
We recognize that a hypothetical question is not objectionable merely because it fails to include every fact shown by the evidence, Lehigh Portland Cement Co. v. Dobbins,282 Ala. 513, 213 So.2d 246 (1968), but it must incorporate "sufficient facts in evidence upon which an expert opinion can fairly be based." Barfield v. Wright, 286 Ala. 402,240 So.2d 593 (1970). Here, it is clear from the record that no attempt was made to hypothesize the facts on which Dr. Campbell's opinion was based.
It was also error to allow Dr. Campbell to testify that, in his opinion, Mrs. Thompson died of a voluntary drug overdose. In order for expert testimony to be helpful to the trier of fact, it must appear that the subject matter is beyond the ken of the average layman. Thomas v. State, 249 Ala. 358,31 So.2d 71 (1947); Hicks v. State, 247 Ala. 439, 25 So.2d 139 (1946). The determination of "voluntariness," if relevant at all, should be left to the jury.
Because the court erred in allowing this evidence, its judgment is reversed, and the cause is remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and ADAMS, JJ., concur.
[1] The hospital was also named as a defendant, but was later dismissed pursuant to a settlement. The hospital is, therefore, not involved in this appeal.
[2] In Cotton v. Gamble, 355 So.2d 350 (Ala. 1978), for example, a treating physician was allowed to give opinion testimony based on a physical examination of a party. This first-hand knowledge made it un necessary to hypothesize the facts on which the physician's opinion was based.