This is a medical malpractice case. The plaintiff, Dorise Romine, as administratrix of the estate of her mother, Edith Brooks, filed suit against defendants Medicenters of America, Inc., and Jerry Lewis, M.D., alleging negligence in the treatment and care of her mother. The case was tried before a jury, which returned a verdict in favor of both defendants. From a judgment entered on that verdict, the plaintiff appeals. We affirm.
In February of 1977, Edith Brooks was admitted as a patient to Lloyd Noland Hospital in Birmingham, where she was diagnosed and treated for pneumonia. In May of that year, following her release from the hospital, she fell at home and sustained a fracture to her hip. She was treated for this injury at Lloyd Noland. Following her discharge from the hospital, she suffered a stroke and, on July 5, 1977, was admitted to the University of Alabama Medical Center *Page 53 
in Birmingham (UAB), where she remained until July 27, 1977. Her treating physician at UAB was Dr. Frank Bonikowski, who diagnosed her as suffering from, inter alia, a subarchnoid hemorrhage, thrombophlebitis of the right leg, anemia, dementia, and organic heart disease.
A subarchnoid hemorrhage involves bleeding into or around the brain. In Dr. Bonikowski's opinion, the most probable cause of Edith Brooks's hemorrhage was the rupture of a Berry aneurysm. Such an aneurysm is a weakening of the wall of a blood vessel. With elevated blood pressure, the vessel is subject to rupture. Dr. Bonikowski became concerned that a "rebleed" of the aneurysm might occur. The statistical rate of a "rebleed" is high and carries with it a significant mortality rate. To prevent a "rebleed," surgery was indicated, during which the weakened portion of the blood vessel would be clipped. Because of her overall condition, Edith Brooks was determined ineligible for this surgical procedure. Consequently, she was discharged from UAB to Medicenter, an extended care facility in Birmingham. Her treating physician at Medicenter was Dr. Jerry Lewis, who testified as to her condition upon admittance as follows:
 "I had a rather thin, elderly little lady with frail skin who already had a bedsore. She had a history of pneumonia. Confusion. She was combative, couldn't control her. She was bedridden. She couldn't get up on her own. She could only get up with help into a wheelchair. She had had an awful stroke from the Berry aneurysm that ruptured. And this Berry aneurysm when it ruptures, it just kind of — blood just pumps out into the brain. And you can imagine there's nothing to stop it and it puts pressure on the brain. It fills the skull up with blood. And it causes an awful insult.
". . . .
 "Mrs. Brooks had had a big stroke. It had damaged part of the mid brain. The brain is divided into several sections. The part of the brain that was damaged had to do with her swallowing, the ability to swallow. She could not swallow. She would try, but she could not. She had to be fed with a tube through her nose.
 "She couldn't control her bowel movements. The NG feedings caused her to have trouble with episodes of severe diarrhea.
 "She had a Foley catheter because she couldn't control her bladder. And it's a problem that we have to deal with in nursing homes that we hate to deal with. It's a problem that even if you put a catheter in and keep them dry, or you leave the catheter out, and their urinary retention and they wet all over themselves intermittently. And it's just an awful problem.
 "If you leave that catheter in which we have to, I mean, in a man or woman, they end up getting chronic recurrent kidney infections, bladder infections. And they keep them in constantly.
". . . .
 "She had one all the time. Anyone with a Foley catheter in place by definition is going to have a chronic, is going to have a chronic kidney infection or bladder infection. There's just no way you can prevent it. And you only treat it when it gets severely symptomatic because the blood's — in an infection, if you keep giving a person who has a chronic infection, if you give them antibiotics, those bugs get resistant to it. It's kind of like the rats you read about now that you can't kill with rat poison. It's the same way. The bugs — the germs and bacteria that infect us, cause — get resistant to these antibiotics."
Subsequent to her discharge from Medicenter, Edith Brooks was cared for by nurses in the home of a member of her family. She remained there approximately nine days before, once again, being admitted to Lloyd Noland Hospital, where she died on November 5, 1977. No autopsy was performed.
At trial, the plaintiff presented evidence tending to show that Edith Brooks died as *Page 54 
a result of a blood infection[1] and malnutrition caused by the negligent treatment and care of the defendants. The defendants presented evidence to the contrary tending to show that Edith Brooks was properly cared for and that her death resulted from other causes. One of the defendants' witnesses was Dr. Bonikowski, whose testimony was taken by deposition and read to the jury. During cross examination by plaintiff's counsel, the following transpired pertaining to Dr. Bonikowski's previous contacts with Roy Scholl, attorney for Dr. Lewis:
 "Q. Dr. Bonikowski, my name is Russell Tarver. I represent Dorise Romine, who is the plaintiff in this case. I would like to ask you when you had your first contact with Mr. Scholl, please?
"A. It was sometime in 1982.
"Q. And how were you contacted by Mr. Scholl?
 "A. He informed me that he was defending Dr. Lewis concerning the case of Mrs. Brooks and concerning the occurrence of decubitus ulcerations.
"Q. Did you know Dr. Lewis at the time?
"A. I don't know Dr. Lewis.
 "Q. How many times have you talked with Mr. Scholl all together regarding this case?
"A. Approximately three times."
"Q. When were the other two times, please?
 "A. I would have to ask Mr. Scholl. Sometime around November?
MR. SCHOLL: Fall, November.
"A. And approximately one or two months before.
". . . .
 "Q. And of course, you talked with Mr. Scholl today before we started this deposition?
"A. That's correct.
". . . .
 "Q. Would you please show the jury your authorization to — which — authorizes you to consult with and to discuss this case with Mr. Scholl.
"A. I don't have those specific —
 "Q. Well, you're testifying in regard to Edith O. Brooks, the deceased in this case. Now, she was your patient; is that correct?
"A. That's right.
 "Q. And the doctor-patient relationship existed between the two of you.
"A. That's correct.
 "Q. And you're aware, of course, that under your ethics you are not supposed to consult with anyone concerning her treatment without an authorization from her or her family; is that not right?
 "MR. SCHOLL: That's a misstatement of the law, and we object to it. There is no such thing as a patient-physician relationship. . . . If you look into the matter, you will see that's the truth of the matter.
"BY MR. TARVER:
"Q. Well, answer the question, doctor, please.
"A. I do not know the answer.
 "Q. You do not know the answer. Did you feel obliged to discuss the matter with anyone in the family before you talked to the attorney representing Dr. Lewis?
"A. No."
The plaintiff contends that Dr. Bonikowski's deposition testimony was rendered inadmissible as a result of the contacts which he had with counsel for Dr. Lewis prior to the taking of his deposition. She does not argue that his testimony was inadmissible absent these contacts,[2] only that she, as the *Page 55 
representative of her mother's estate, did not authorize them, and, consequently, that the trial court erred to reversal in denying her pre-trial motion to exclude his testimony. We disagree.
In Doe v. Eli Lilly Co., 99 F.R.D. 126 (D.D.C. 1983), the court, construing the Federal Rules of Civil Procedure, stated:
 "As a general proposition, however, no party to litigation has anything resembling a proprietary right to any witness's evidence. Absent a privilege no party is entitled to restrict an opponent's access to a witness, however partial or important to him, by insisting upon some notion of allegiance. See International Business Machines Corp. v. Edelstein, 526 F.2d 37, 41-44 (2d Cir. 1975); Gregory v. United States, 369 F.2d 185, 187-88 (D.C. Cir. 1966); Edmund J. Flynn Co. v. LaVay, 431 A.2d 543, 551 (D.C. 1981); 8 J. Wigmore, Evidence § 2192 (McNaughton rev. ed. 1961). Even an expert whose knowledge has been purchased cannot be silenced by the party who is paying him on that ground alone. Unless impeded by privilege an adversary may inquire, in advance of trial, by any lawful manner to learn what any witness knows if other appropriate conditions the witness alone may impose are satisfied, e.g., compensation for his time and expertise or payment of reasonable expenses involved, and while the Federal Rules of Civil Procedure have provided certain specific formal methods of acquiring evidence from recalcitrant sources by compulsion, they have never been thought to preclude the use of such venerable, if informal, discovery techniques as the ex parte interview of a witness who is willing to speak. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); see International Business Machines Corp. v. Edelstein, 526 F.2d at 43-44; cf. Gregory v. United States, 369 F.2d at 187-88; Trans-World Investments v. Drobny, 554 P.2d 1148, 1151-52 (Alaska 1976).
 "The potential for influencing trial testimony is inherent in every contact between a prospective witness and an interlocutor, formal or informal, and what a litigant may justifiably fear is an attempt by an adversary at improper influence for which there are sanctions enough if it occurs. See Gregory v. United States, 369 F.2d at 188. And there are entirely respectable reasons for conducting discovery by interview vice deposition: it is less costly and less likely to entail logistical or scheduling problems; it is conducive to spontaneity and candor in a way depositions can never be; and it is a cost-efficient means of eliminating nonessential witnesses from the list completely."
99 F.R.D. at 128.
Although the record in the present case is silent as to what, if any, information was actually exchanged between Dr. Bonikowski and counsel for Dr. Lewis during their conversations, presumably these contacts were for the purpose of ascertaining whether Dr. Bonikowski, in fact, had any information or opinions relevant to the case. The plaintiff's counsel was notified of and was in attendance at the taking of the doctor's deposition. Accordingly, we find no error on the part of the trial court in denying the plaintiff's pre-trial motion to exclude Dr. Bonikowski's testimony.[3] *Page 56 
Another witness for the defendants was Dr. Jack Whites. The plaintiff contends that the trial court committed reversible error in allowing both Dr. Bonikowski and Dr. Whites to give their opinions as to the probable cause of Edith Brooks's death and the standard of treatment and care exercised by the defendants. She argues that no predicate was laid for the admission of either expert's testimony. Again, we disagree.
An expert witness may give opinion testimony based upon either facts of which he has personal knowledge or facts which are assumed in a hypothetical question. In either event, the facts known to the expert or hypothesized must be facts in evidence. Thompson v. Jarrell, 460 So.2d 148 (Ala. 1984). An expert witness giving an opinion upon facts of his own knowledge or based upon his own observations should first testify to those facts upon which his opinion is based, AlabamaPower Co. v. Robinson, 447 So.2d 148 (Ala. 1983); but if the facts sought to be proved are such that they will be difficult of understanding and of little aid to the jury, the court may permit an expert on the subject, who has made an investigation, to give his opinion without giving the details on which the opinion is based. Malone-McConnell Real Estate Co. v. J.B.Simpson Audit Co., 197 Ala. 677, 73 So. 369 (1916).
Dr. Bonikowski was Edith Brooks's treating physician at UAB. He had personal knowledge of her overall condition, which he had observed and diagnosed while she was a patient there. On the basis of this knowledge, coupled with his review of her medical records[4] concerning her condition and the follow-up care which she received during the four months immediately preceding her death, he testified as follows:
"Q. Doctor, I wish you would tell me based upon your care and treatment of this lady, Mrs. Edith Brooks, what the probable cause of her death was. And if there are multiple causes tell us what those other probable causes would be, please.
"A. The probable cause of death of any patient who has had a ruptured Berry aneurysm would be a rebleeding of the Berry aneurysm.
"Q. Is that in the head, rebleeding in the head?
"A. Yes.
"Q. Is that, are you listing these as the most probable first, or how?
"A. Yes.
"Q. That would be the most probable cause of the death of Edith Brooks?
"A. The most probable cause of death in Mrs. Brooks would have been a rupture, a rebleed of the aneurysm that she had bled from in July.
"Q. Are there other probable causes of her death? If so, would you list them in their order of probability, please.
"A. The second most probable cause in a patient who's lying in bed for any length of time who has had a documented case of phlebitis, this lady had phlebitis in the legs and had been lying in bed for a long time not able to move in a normal fashion. The second most common — most likely — cause of death in this lady would have been a blood clot to her lung from her legs.
"Q. Is there a third probable cause?
"A. It's apparent from the chart that the patient — well, the patient also had known heart disease and she might have had, from her age, she might have had a myocardial infarction. She could have had a heart attack.
"Q. Would that be from the same condition that we discussed as being an arteriosclerotic heart?
"A. Yes.
"Q. Are there other probable causes, please sir? If you don't mind, list them in the order of probability.
"A. The patient had two other areas of infection that are common in patients who *Page 57 
have been sick for any length of time. She had an aspiration pneumonia, she had —
"Q. What is that, please, sir?
"A. That means that in the course of her eating, because she was unable to swallow in a normal fashion, she had a tendency to have the food go down in through her windpipe into her lung and cause an infection. She had pneumonia that was documented on her X-rays when she went into Lloyd Noland Hospital, that was more on the right side. This is a typical pattern of infection that occurs in patients who are sick with chronic disease.
"Q. Was this the second Lloyd Noland hospitalization or the one after she was at Medicenter, right before she died?
"A. This is at the time just prior to her death.
"Q. Now, with an aspiration pneumonia, does it simply mean that the food instead of going down the throat to the stomach goes down the windpipe into the lungs and causes infection?
"A. That's right.
"Q. Is that what she had?
"A. She had an aspiration pneumonia.
"Q. Is that a fourth probable cause of her death?
"A. Yes, it is an additional possible cause of her death.
"Q. Are there others, please sir?
"A. This patient had a chronic anemia that we had evaluated while she was at the University. It was the type of anemia a low blood count that often goes with people who are sick for any length of time, and this anemia was relatively serious. She had, her hemoglobin level, was around 9 in July. At the time she went into Lloyd Noland Hospital, her hemoglobin was 6.
"Q. What's normal?
"A. 15.
". . . .
"Q. Let me discuss with you for just a minute, please, sir, the allegation made against the Defendants in this case that we, the doctors and nurses through their care or lack of the same, caused this lady to develop decubitus ulcers that caused her death. Do you have an opinion as to whether the decubitus ulcers which this lady developed in University Hospital and which she had at Medicenter, caused or contributed to cause her death?
"A. Yes, sir, I do.
"Q. Give me those opinions, please sir. You might relate it to the other causes that you've already talked about, please.
"A. Well, the situation is essentially that although Mrs. Brooks had decubitus ulcers, there's no question that she had the ulcers —
"Q. That's right.
"A. That they are, it is unlikely that those ulcers were the cause of her death. That there was not evidence of suspended infection from the records. She did not have a fever, she did not have an elevation of the white count that would have been indications that the infection itself would have been the cause of her death. Secondly, she had two other sources of infection that could have caused death. She had a pneumonia and she had a urinary tract infection. Both of those were equally likely to have caused sepsis, or blood infection, poisoning of the blood, if you want to use a common term. In other words, the only way that the decubitus would have likely caused this lady's death would have been by infection getting into the bloodstream.
"Q. Is that what you refer to as sepsis?
"A. Sepsis, yes.
"Q. What is sepsis, please?
"A. That means organisms, bacteria getting into the bloodstream and causing shock and death. So that in order for a decubitus ulcer to cause death, you would have to have proof that there were organisms in this lady's bloodstream or that she had an elevation of temperature, or that she had an elevation of the white count to indicate that infection in fact caused death. [From] the record, there is no elevation of the white count . . . and there was no fever. Instead, the patient entered the hospital *Page 58 
with obtundation [decreased responsiveness] and had an aneurysm and the other causes that were listed are much more likely to be causes for death. A rebleeding of an aneurysm, possibly of a blood clot to the lungs, the possibility of the anemia causing heart failure, causing a myocardial infarction, all are far more likely.
"Q. One last question, Dr. Bonikowski. Did Dr. Jerry Lewis, in your opinion, do anything to cause this woman's death, or fail to do anything that caused this woman's death?
"A. I don't believe so.
"Q. That's all I have. Thank you, sir.
". . . .
"Q. Doctor, my name is Billy Bates. I represent Medicenter. I take it in preparing for your deposition, you had a chance to review the records on Mrs. Brooks that were kept by Medicenter.
"A. Yes, I have.
"Q. And, after reviewing those records, do you have any criticism of the treatment of Mrs. Brooks by Medicenter?
"A. I don't have a specific criticism. I believe that as well as I could determine, that is without my being able to observe, so that you're asking me that by looking at the records, whether I can tell whether anything was done. All I can say is that the patient received the usual care for bedsores. She had bedsores. They obviously got worse. In the course of her getting worse, the proper management would be to clean them and to take away the dead tissue and to try to promote healing, and also to keep pressure off them. You can do that very easily with a normal patient and a person who is cooperative and alert, but, in patients who are not cooperative, who are unable to understand or to do what is asked, it becomes very difficult, and it would appear that, you know, my understanding was that the patient received padding; that she was turned; the wounds were cleansed, and that she actually received antibiotics.
"Q. In your opinion, did Medicenter do anything or fail to do anything which contributed [to] or caused Mrs. Brooks's death?
"A. Well, I have already stated that it's my opinion that the decubiti were not primarily related to her death.
"Q. So would your answer to the question then be no?
"A. No."
Dr. Bonikowski's opinions were based upon his personal knowledge of the facts which were clearly stated in his testimony, and there was no error in their admission.
Dr. Whites testified as follows:
"Q. Dr. Whites, assuming that you have a 77-year-old female who has a broken hip; who's disoriented, unresponsive, unaware of her surroundings, unrehabilitatable; who has a bedsore or hole on her sacrum when admitted; flexer contractions of the hip and knee; physical therapy did not help; blood clots in both legs, combative, not a candidate for surgery, dehydrated, urinary tract infection, heart disease, organic brain syndrome, and an unclipped Berry aneurysm.
"Assuming those facts and all the facts that you are able to glean from the records, and your training as a doctor, I want to talk about whether you have an opinion as to more probable causes of death than malnutrition, or generalized septic infection. And I'll ask you first rebleed for an aneurysm. Is that a more probable cause of death under those circumstances or not?
"A. That's one of the — to me that is one of the three most probable causes.
"Q. What's the next one in your judgment?
"A. Pulmonary thromboembolism or aspiration pneumonia.
"Q. In that order?
"A. Any order, it doesn't make any difference.
"Q. Would each of these be more likely the cause of death than the malnutrition, the low protein, the low albumin? *Page 59 
"A. I think any of those would be a more likely cause of death, yes.
"Q. Could the arteriosclerotic heart also be a more probable cause of death?
"A. It could be.
"Q. No way to know about that one, is there, without an autopsy?
"A. That's right.
"Q. Doctor, was there some point in time during the history of this lady's unfortunate medical problems where the future could be predicted, or did you form a prognosis as to how she was going to do?
"A. As I remember the record, when she presented initially, on the initial record at Lloyd Noland, they discussed or they mentioned organic brain syndrome, confusion and so forth.
"Q. Is it back in here (indicating)?
"A. Back with the pneumonia, uh-huh.
"Q. Okay.
"A. And that was mentioned the next time when she had the fracture. I think once she had the CVA, or the rupture of the Berry aneurysm in July, it was that, you know, that the future was, you know, fairly predictable over what was going to happen over the next several months to a year.
"Q. And did that happen?
"A. Yes, pretty much.
"Q. She just continued to go downhill and just die?
"A. Yes, a few months later, yes.
"Q. So, right here (indicating), you had a pretty predictable outcome of this patient; is that right?
"A. At that point, you're able to give the family a prognosis, I think.
"Q. Which was not good, was it?
"A. It was not good.
"Q. Do these things happen in patients that are like this in a nursing home?
"A. Yes, we've all seen those. You know you have basically a patient who is going to deteriorate mentally, and with mental deterioration goes physical deterioration frequently. And, you know, each insult just adds another level of stress.
"With the aneurysm, it's, you know, predictable, fairly predictable. I don't know the exact statistics, but, once you rupture an aneurysm, if it's not amenable to surgery and you can't take that out of the circulation by clipping or tying it off, a large percentage will rebleed fairly soon, you know, within a year or so. And I think that's the prognosis you can give a family.
"Q. Do some patients, particularly like I've hypothesized here to you, get decubitus ulcers in spite of the best care that can be given to them?
"A. Yes.
". . . .
"Q. . . . Now, let me ask you this: You've reviewed the Medicenter chart, have you not, sir?
"A. Yes.
"Q. And are you familiar with the care, the general standard of care, that was applicable to nursing homes in 1977?
"A. I believe so.
"Q. All right, based upon your review of the records [of the Medicenter nursing charts], do you have any criticisms of the care given by Medicenter to Mrs. Brooks?
 "MR. TARVER: I have to renew my objection for the record.
 "THE COURT: I'll overrule the objection to that question. You can answer that.
"A. No."
Again, there was no error in the trial court's admission of this testimony. Dr. Whites's opinion as to the probable cause of Edith Brooks's death was based upon the hypothetical and his review of her medical records, the pertinent portions of which were stated in his testimony. Furthermore, based upon his familiarity with the general standard of care applicable to facilities such as Medicenter, his testimony that he had no criticism of the care provided by Medicenter to Edith Brooks was not objectionable. The medical records upon *Page 60 
which his opinions were based were admitted into evidence. A restatement by the witness of the content of those records would have been time consuming and of little aid to the jury.
Thompson v. Jarrell, supra, cited by the plaintiff as standing for the proposition that a physician's review of the medical records is insufficient to permit him to give an opinion in the absence of a stated hypothetical, is factually distinguishable. In that case, contrary to the present case, it was not clear from the record whether the medical reports examined by the testifying physician contained sufficient information upon which his opinion could be based, and the Court noted that he did not state any supporting facts during his testimony.
The judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and BEATTY, JJ., concur.
[1] The plaintiff claimed that the defendants allowed Edith Brooks to develop decubitus ulcers (bedsores), which ultimately became infected and led to septicemia, a severe generalized or systemic bloodstream infection.
[2] There is no testimonial privilege in Alabama covering communications between a physician and his patient or the physician's knowledge of the patient's condition acquired by reason of the relationship. C. Gamble, McElroy's AlabamaEvidence § 413.01 (3d ed. 1977), citing Horne v. Patton,291 Ala. 701, 287 So.2d 824 (1973); Gulledge v. Mitchell, 242 Ala. 342, 6 So.2d 22 (1942); Dyer v. State, 241 Ala. 679,4 So.2d 311 (1941); Beecher v. State, 288 Ala. 1, 256 So.2d 154,rev'd, 408 U.S. 234, 92 S.Ct. 2282, 33 L.Ed.2d 317 (1972); Annot., 7 A.L.R.3d 1458 (1966). See also Mull v. String,448 So.2d 952 (1984).
[3] In each of those cases cited to us by the plaintiff as being in support of her contention, the court's condemnation and restriction of informal attorney-physician communications contain a similar rationale — the pre-eminence of the patient's privacy interest is buttressed upon the presence of a statutory physician-patient testimonial privilege and/or coercive or improper conduct on the part of defense attorneys seeking disclosure of confidential information from the patient's physician via private interviews outside conventional discovery procedures. See Alexander v. Knight, 197 Pa. Super. 79, 177 A.2d 142 (1962); Anker v. Brodnitz, 98 Misc.2d 148,413 N.Y.S.2d 582 (1979); Hammonds v. Aetna Casualty and Surety Co.,243 F. Supp. 793 (N.D. Ohio 1965); Piller v. Kovarsky,194 N.J. Super. 392, 476 A.2d 1279 (1984); Garner v. Ford Motor Co.,61 F.R.D. 22 (D. Alaska 1973); Wenninger v. Muesing, 307 Minn. 405,240 N.W.2d 333 (1976); and Miles v. Farrell, 549 F. Supp. 82
(N.D.Ill. 1982). There are no allegations of coercion or impropriety in the present case.
[4] These medical records were admitted into evidence.