Ms. Williams was pregnant. She contacted Summit Medical Center and made an appointment to have her pregnancy aborted. The year before the medical procedure *Page 64 
made the basis of this suit, Ms. Williams had had an abortion at another clinic without complications. She attended a counseling session at Summit and reviewed forms, including a form entitled "Consent to Abortion," which contained the following:
 "I understand that having an abortion involves some risks to me, including the following: . . . Ectopic pregnancy or pregnancy in the tubes (I understand that in approximately 2% of all pregnancies the pregnancy can be in the fallopian tubes leading to the uterus and an abortion procedure will not successfully terminate such a pregnancy, and that due to the threat of rupture of the fallopian tubes, immediate hospitalization may be necessary); and Incomplete abortion (in some instances all tissue may not be removed and incomplete abortion will result). I understand that the doctor and the clinic make no guarantee regarding the abortion. . . . If the abortion is incomplete I understand that the procedure may have to be repeated or I may still be pregnant." (Emphasis added.)
In her deposition Ms. Williams testified that she recalled being told of the risks associated with the procedure. She signed and acknowledged receipt of the "Consent to Abortion" form.
Dr. Robinson is a diplomate of the American Board of Obstetrics and Gynecology. At the time the procedure in question was performed on Ms. Williams, he had practiced obstetrics and gynecology for over thirty years and had performed numerous abortions. Dr. Robinson was not an employee of Summit, but an independent contractor.
On December 10, 1982, Dr. Robinson performed a hands-on examination of Ms. Williams and then used a suction device designed to effect the abortion. He examined the substance removed from Ms. Williams and determined that it was the product of conception and represented an intrauterine pregnancy which had been aborted. Subsequently this substance was microscopically examined by a pathologist, whose report showed that it contained fragments of decidual (lining of the uterus wall) and chorionic villi (placenta), which substantiated Dr. Robinson's conclusion that a product of conception had been removed from Ms. Williams.
Ms. Williams was given both verbal and written instructions and an appointment three and a half weeks later at Summit. The appointment was not with Dr. Robinson. Ms. Williams called Summit twice after the procedure, complaining of "feeling pregnant," morning sickness, lack of bleeding, and stomach pains. She never talked with Dr. Robinson, nor did she ask to speak with him. There is no evidence that Summit ever notified Dr. Robinson of her calls.
On December 18, 1982, several hours after Ms. William's second call to Summit, she was taken to a hospital for emergency exploratory surgery. The surgery was performed by Dr. Moses Awoniyi, a board eligible obstetrician and gynecologist. He discovered that Ms. Williams had an ectopic pregnancy (i.e., a pregnancy in the fallopian tube outside the uterine cavity) and aborted it. The fetus removed from the fallopian tube by Dr. Awoniyi showed no signs of necrosis or damage.
The evidence showed that the odds of having an intrauterine and ectopic pregnancy at the same time are 30,000 to 1 and that a physician would not have looked for an ectopic pregnancy after diagnosing an intrauterine pregnancy. This is not contradicted by expert medical testimony.
The majority correctly sets out our standard of review in this case. This being a medical malpractice action, it was encumbent upon Ms. Williams to establish by expert testimony the appropriate standard of care and a breach thereof by Dr. Robinson. Gilbert v. Campbell, 440 So.2d 1048 (Ala. 1983);Rosemont, Inc. v. Marshall, 481 So.2d 1126 (Ala. 1985). This she did not do. There is no evidence that Dr. Robinson failed to advise Ms. Williams of the risks associated with the abortion procedure. In fact, the evidence is clearly to the contrary. Furthermore, there is no evidence that Dr. Robinson was negligent in failing to provide post-operative care. All of Ms. Williams's communications were with Summit. *Page 65 
Dr. Robinson was never notified of Ms. Williams's telephone calls.
The majority relies on the deposition and affidavit testimony of Dr. Josefino Aguilar, a board certified forensic pathologist and general medical practitioner, to find evidence of Dr. Robinson's negligence in performing the procedure in question. The thrust of Dr. Aguilar's testimony is that "it is more probable that [Ms. Williams had] a single tubal ectopic pregnancy near the corner of the uterus instead of [a] dual pregnancy." He bases this conclusion on the following:
1) the pathologist's report on the substance removed from Ms.Williams's uterus. Dr. Aguilar testified that in his opinion the report was not thorough enough (while Dr. Aguilar admitted that the report stated that a product of conception (chorionic villi) had been removed, because the product of conception was not specifically described and there was no mention of a fetus, he speculated that a product of conception may not have been present in the sample examined);
2) conceding the presence of a product of conception in the substance removed from Ms. Williams, the possibility that itwas actually removed from the fallopian tube (instead of theuterus) by the suction device used by Dr. Robinson; and,
3) the fact that dual pregnancies are rare (the odds against one are 30,000 to 1).
An expert witness may give opinion testimony based upon either facts of which he has personal knowledge or facts which are assumed in a hypothetical question. In either event, our cases are clear that the facts known to the expert or hypothesized must be facts in evidence. Romine v. Medicentersof America, Inc., 476 So.2d 51 (Ala. 1985). Dr. Aguilar's opinion testimony in this case is not based on the undisputed facts which are in evidence. The pathologist's report verified Dr. Robinson's testimony that a product of conception had been removed from Ms. Williams. It was also established that the fetus removed from Ms. Williams's fallopian tube during the December 18 emergency surgery showed no signs of necrosis or damage. Necrosis or damage would have occurred within approximately three hours of the December 10 procedure performed by Dr. Robinson had the suction device used in that procedure removed a product of conception from the fallopian tube. Therefore, Dr. Aguilar's opinion that a product of conception may not have been removed by Dr. Robinson, or that if it had been it was removed from the fallopian tube, is simply not based on the undisputed facts in evidence. The undisputed facts in this case show that chorionic villi are a product of conception and that chorionic villi were removed from Ms. Williams's uterus, not her fallopian tube. Ms. Williams could not have had chorionic villi in her uterus without having a pregnancy there. I agree with the trial court's observation that "the failure of the pathologist to make a statement concerning fetal material or an embryo does not of itself raise suspicion or negate the conclusion that [Ms.] Williams did have an intrauterine pregnancy." Furthermore, the rarity of a dual pregnancy does not in and of itself provide an adequate foundation for Dr. Aguilar's opinion that such a pregnancy did not exist in this case.
There was no legally admissible evidence introduced by Ms. Williams to show that she did not have an intrauterine pregnancy which was aborted by Dr. Robinson. Given this, there is no evidence that Dr. Robinson breached the appropriate standard of care. A physician would not have looked for an ectopic pregnancy after diagnosing an intrauterine pregnancy.
In my special concurrence in Creel v. Brown, 508 So.2d 684
(Ala. 1987), I posed the question of whether a witness's isolated answer to a particular question, removed from the totality of the testimony of that witness which explains or qualifies that answer, satisfies our scintilla-of-evidence sufficiency standard. I remain convinced that it does not. Likewise, I do not believe that a witness's isolated statement removed from the foundation on which that isolated statement is predicated, satisfies our scintilla-of-evidence sufficiency standard. I believe that we must review all of the testimony of a particular witness and *Page 66 
review it in the light of all other evidence to determine whether that witness has provided any evidence to take a plaintiff's case to the jury. In this case, if I consider only certain of Dr. Aguilar's opinions expressed in his affidavit, I could logically infer that Dr. Robinson was negligent in his treatment of Ms. Williams. However, if I consider all of Dr. Aguilar's testimony and all other legal evidence introduced, on which Dr. Aguilar's opinion must be based, any gleam, glimmer, spark, or trace of evidence that Dr. Robinson deviated from the appropriate standard of medical care in treating Ms. Williams disappears. Therefore, I must respectfully dissent.
TORBERT, C.J., and STEAGALL, J., concur.