[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 995 
On June 21, 1999, Helen Zaden sued Dr. Richard Elkus, an orthopedic surgeon, asserting claims of medical malpractice based on an injury she allegedly suffered during the course of a surgical procedure performed by Dr. Elkus. As finally amended, Zaden's complaint presented claims of negligent and wanton breach of the standard of care. A jury rendered a verdict in favor of Dr. Elkus and the trial court entered a judgment on that verdict. Zaden then appealed to this Court. The dispositive issues presented in this case are whether the trial court improperly refused to allow Zaden discovery from a potential witness, who later testified at *Page 996 
trial, concerning a possible bias on the part of some of the physicians who had treated Zaden, assuming that the physicians had been provided with attorneys hired by Dr. Elkus's medical-liability insurer, and whether the ex parte interviews Dr. Elkus's attorneys conducted with certain of Zaden's treating physicians were improper.
 I. Procedural History and Facts
On July 31, 1997, Zaden was admitted to St. Vincent's Hospital, where she underwent total left hip-replacement surgery; Dr. Elkus performed the surgery. Zaden asserts that immediately after the surgery she was unable to move her left leg and that she had no feeling in her left leg or her left foot.[1] Dr. Elkus was of the opinion that her problem was the result of some stretching or bruising of the sciatic nerve that had apparently occurred during the operation. Dr. Elkus referred Zaden to HealthSouth Rehabilitation Hospital-Lakeshore ("HealthSouth"), where she stayed for approximately two months. While there, she was treated by various physicians, including Dr. Martin Salmon, a physical-medicine and rehabilitation specialist; Dr. David O'Neal, a neurologist; Dr. Sandra Lynn Durham, a pain-management specialist; and Dr. Richard Sanders, an orthopedic surgeon.
Dr. Salmon, as Zaden's primary treating physician at HealthSouth, concluded that her symptoms were consistent with an injury to her sciatic nerve[2] and that such an injury could have resulted from bruising or stretching of the nerve during the hip-replacement operation. Dr. Salmon referred Zaden to Dr. Finley McRae, a neurosurgeon, for another opinion. Dr. McRae likewise concluded that Zaden had suffered an injury to her sciatic nerve during the hip-replacement surgery, probably as a result of stretching or bruising. Thereafter, Zaden came under the care of Dr. Sanders and was treated by him for approximately one year.
Because of continuing pain, on November 20, 1998, Dr. Sanders performed a "neurolysis in an attempt to free up the sciatic nerve from the adjacent scar tissue."[3] During this surgical procedure, Dr. Sanders discovered that Zaden's left sciatic nerve was transected, or separated, and that the gap was an inch and a half to two inches, a condition that he believed was permanent. Upon learning of Dr. Sanders's discovery, Zaden sued Dr. Elkus, alleging that he had breached the medical standard of care by transecting her sciatic nerve during the hip-replacement surgery. In her principal brief to this Court, Zaden says that Dr. Elkus acknowledged responsibility for "injuring" the nerve, but claimed that he would have only bruised, damaged, or stretched it, all of which were known possible complications of the surgical procedure.
During the discovery that followed, Dr. Salmon's deposition was taken. At that deposition, Reed Bates, a lawyer from the Birmingham law firm of Starnes Atchison, *Page 997 
appeared on behalf of Dr. Elkus, and Frank Burge of the firm Burge Wettermark appeared on behalf of Zaden. Also attending was Robert Cooper of the Birmingham law firm of Christian 
Small; Cooper was not an attorney of record in the case, but stated that he was present to represent Dr. Salmon. Zaden states that at this deposition Dr. Salmon exhibited "evasiveness" that, she says, became "disconcerting" and "suspicious." This evasiveness was shown, she argues, by Dr. Salmon's testimony after he was shown a schematic drawing of the left hip and left thigh depicting the nerves in that area and was asked to assume that a portion of Zaden's sciatic nerve had been transected and was missing:
 "Q: . . . [W]hat part, if any, [would the transected or missing portion of Zaden's sciatic nerve] play in the symptomatology that you found and the complaints that you took from Ms. Helen Zaden at the time you did the history and physical?
 "Mr. Bates: Excuse me, Doctor. I need to object to the form of the question. It's an improper hypothetical, but —
"Q: You may answer, sir.
"A: I don't like hypothetical questions.
". . . .
 "Q: Okay. Then tell us whether or not the symptomatology you found and recorded in the history and physical would be consistent with that much of a sciatic nerve being transected out or missing when surgery was performed a few months later.
 "Mr. Bates: Object to the form. Improper hypothetical.
"A: I don't know.
". . . .
 "Q: Would the fact that there was no response [that] could be elicited from the left sural[4]
sensory nerve be consistent with the section of Ms. Zaden's sciatic nerve that was missing when her second surgery was performed a couple — several months after the hip replacement was done by Dr. Elkus?
 "Mr. Bates: Object to the form. Improper hypothetical.
 "A: It could be a bruise or any damage. It doesn't mean that it was resected or anything like that.
". . . .
 "Q: I'm asking you, assume that when Dr. Sanders did the surgery, he found this missing and he marked it in this Plaintiff's Exhibit 2. Assume that to be true. Would that bring about, quote, `no response elicited from the left sural sensory nerve,' as reported to you by Dr. O'Neal?
 "Mr. Bates: Object to the form. Improper hypothetical.
 "A: Not necessarily. And I think you'd best ask Dr. O'Neal.
". . . .
 "Q: [Dr. O'Neal] might be able to give me a better answer. But based upon your education, training and experience in your profession, give us your answer. If you cut that much of the nerve out up at the hip joint, you're going to have severe neuropathies in everything distal to where it's cut out aren't you, Doctor?
"Mr. Bates: Object to the form.
"A: It's not my specialty. I don't know. *Page 998 
 "Q: You spent a year in post-graduate work in neurology; is that true sir?[5]
"A: Yes.
 "Q: And why do you not know that if you cut out a big hunk of the sciatic nerve that it will not cause neuropathies distal to that in two segments that branch off of that sciatic nerve, the peroneal and the tibial?
"A: Like I told you, I think it would, but you'd —
"Q: You think it would?
"A: — do best to ask Dr. O'Neal.
 "Q: Is that your professional opinion that it would? We'll get to Dr. O' Neal. I've got a very good doctor here in front of me right now. Is that your professional opinion that it would?
"Mr. Bates: I object to the form.
 "A: All I can say is, I think it would. But I yield to Dr. O'Neal."
Three weeks later, Zaden deposed Dr. O'Neal. Cooper attended the deposition, stating that he was appearing as Dr. O'Neal's attorney. Zaden states in her brief to this Court that Cooper's appearance at Dr. O'Neal's deposition, coupled with Dr. Salmon's deference to Dr. O'Neal at Dr. Salmon's deposition, made her "suspicious" of Dr. O'Neal's testimony and of Cooper's presence. During Dr. O'Neal's deposition, the following exchange took place:
"Q: Do you know Richard Elkus?
"A: I do.
 "Q: Do you know whether or not your liability insurance is the same as the company that represents Mr. Elkus?
"Mr. Cooper: Don't answer that question, Doctor.
 "Q: Did you hire the gentleman here-the lawyer here, that's representing you today?
"Mr. Cooper: Don't answer that question, Doctor.
 "Q: Are you the person that's going to pay the lawyer that's with you here today, Doctor?
"Mr. Cooper: Don't answer that question, Doctor.
". . . .
"Q: Do you know who your insurance is with?
"Mr. Cooper: Don't answer that question, Doctor.
 "Q: How did you come to meet the gentleman, the lawyer here, that's representing you here today?
"Mr. Cooper: Don't answer that question, Doctor.
 "Q: Have you had any conversation with anybody about this case other than the gentleman who's seated here representing you that's making the objections?
"A: Can you ask that question again?
 "Q: Who have you talked to about this case besides the gentleman here who says he's your lawyer?
"A: Nobody.
 "Q: When did you first talk about this case with the gentleman here who's representing you here today?
"Mr. Cooper: Don't answer that question, Doctor."
Following Dr. O'Neal's deposition, Zaden filed a notice and subpoena to take Cooper's deposition. Dr. Elkus and Cooper filed separate motions to quash the notice and subpoena. According to Zaden, after a hearing the motions were "`neither granted or denied,'" but the trial judge, *Page 999 
instead, "orally instructed Zaden's counsel to pursue other discovery to obtain the same information." Zaden then filed a motion to compel Dr. O'Neal to answer the questions Cooper had told him not to answer, asserting that "[t]he issue before this court is whether [Zaden] is entitled to Dr. O'Neal's testimony which would clarify the role that [Cooper] has played in this litigation and whether that role has led to any witness bias, prejudice or perjury." That motion was opposed by Dr. Elkus and Cooper. After a hearing on the motion, the trial judge entered an order denying Zaden's motion to compel and stating, in part:
 "Rule 502, Alabama Rules of Evidence, provides that a client has a privilege to refuse to disclose a confidential communication with an attorney. The fact of employment is generally not privileged. See, [C. Gamble, McElroy's Alabama Evidence], § 392.02. However, it appears to this Court that any relevance is outweighed by prejudice under Rule 403.
 "Rule 411, Alabama Rules of Evidence, provides that liability insurance is not admissible. In Otwell v. Bryant, 497 So.2d 111 (Ala. 1986), it was held that it was improper to ask defendant's expert whether they were both insured by MASA.[6]
 "It appears to this Court that under Rule 403 any relevance is outweighed by the danger of unfair prejudice. Therefore, [Zaden's] Motion to Compel Testimony of Dr. David O'Neal is denied."
In her brief to this Court, Zaden states that MASA is the "insurance company representing Dr. Elkus." In support of that assertion, she cites a single page of the record. That page is the first page of a six-page order in another, unrelated case,[7] however, and neither that page nor any other page references Dr. Elkus or his insurance carrier. Further, nothing that we have come across in the record identifies Dr. Elkus's insurance carrier or even confirms that he is covered by professional liability insurance. Strongly suggestive of the existence of such insurance, however, is the fact that before trial Dr. Elkus filed a motion in limine, requesting, among other things, that the trial court prohibit Zaden from calling Cooper as a witness and "from referring to the fact that any witness is insured by the same liability insurance carrier as [Dr. Elkus]." The trial court granted that motion.
Zaden also deposed Dr. Durham, and the only attorneys appearing at that deposition were her attorney and Dr. Elkus's attorney. Zaden states that Dr. Durham's testimony took what she characterizes as a "curious turn" when Dr. Durham testified:
 "As a matter of fact, I think it was not until September or October of last year [2001] that we finally — August 20 of last year [2001] that we finally said — told her *Page 1000 
you must make your appointments, because up until then it would be three or four months between appointments."
In rebuttal, Zaden's attorney demonstrated that Dr. Durham's own records proved that all of Zaden's appointments had been monthly or every other month and that she had kept all of those appointments. Zaden explains that she initially dismissed Dr. Durham's "attempt to downgrade [Zaden's] efforts to alleviate her pain"; however, after she subpoenaed Dr. Durham to appear at trial, there occurred a "startling revelation": an attorney from the Christian Small law firm, but not Cooper, filed a "Motion for Relief from Order to Appear" on behalf of Dr. Durham. Therefore, according to Zaden, upon "learning of witnesses' attorney's `alleged' representation of a third treating physician she elected to read Dr. Durham's deposition testimony to the jury." The record reveals, however, that Dr. Durham was not served with a subpoena to appear at trial until the Friday before the Monday on which the trial was scheduled to begin. Dr. Durham telephoned Zaden's attorney that Friday and was told that she need not appear. Nonetheless, she received a telephone message the morning of Thursday, April 18, instructing her to appear at court at 9:00 a.m. Having a full schedule of office appointments in place, she sought legal representation, offering to be available to testify between 11:00 a.m. and 1:00 p.m. that day.
Zaden states that a "[s]trong suspicion of foul play turned to strong evidence during the trial of the case" when Dr. Sanders testified, according to Zaden's characterization of his testimony, contrary to his November 30, 1998, operative report, that he believed that Zaden did not have a transected sciatic nerve, but rather a "very slow to resolve neurapraxia."[8]
Zaden speculates that this "changed" opinion was attributable to a pretrial ex parte meeting between Dr. Sanders and counsel for Dr. Elkus.[9] However, a review of the portion of Dr. Sanders's trial testimony cited by Zaden for this "changed" opinion reveals that when Dr. Sanders referred in his testimony to his belief that Zaden did not have a transected nerve, he was actually reading from an office note he had made during his examination of Zaden on November 4, 1997. Therefore, the note represented his opinion a year before the neurolysis procedure he performed on Zaden; it was only during that procedure that he discovered that her left sciatic nerve was in fact transected. The November 4, 1997, office note stated:
 "We got [Zaden's] EMG which shows that the nerve is not functioning. I do not believe that she has a transection of the nerve but this in fact is a very slow to resolve neurapraxia. She is completely incapacitated with her lack of functional ability due to the nerve palsy. She cannot tie her shoes, she cannot get dressed, she cannot get bathed. She needs a tremendous amount of help with these activities."
(Emphasis supplied.) During questioning at trial regarding what happened to the missing portion of Zaden's sciatic nerve, Dr. Sanders testified that one possibility was that it could have been "cut out."[10] *Page 1001 
The record establishes, more importantly, that on April 6, 2000, before any ex parte meeting between Dr. Elkus's counsel and Dr. Sanders, Zaden's counsel had conducted his own ex parte interview with Dr. Sanders.[11] Following that meeting Zaden's counsel wrote a memorandum summarizing the meeting; that memorandum stated, in part:
 "On April 6, 2000, I met with Dr. Richard Sanders who operated on [Zaden's] hip and found the sciatic nerve `transected.' He said `transection' meant only that the nerve was in two pieces, that it was separated. . . . He could not say whether it was cut. He could not say whether it was pulled apart, but he did say he never heard of a sciatic nerve being cut in a hip replacement.
 "He started the interview saying that he didn't think that [Dr.] Elkus cut it into two pieces. The reason he said he didn't think this was because he had never heard of it. He had never seen anything in the literature and he had never heard of a sciatic nerve being cut into two pieces during hip-replacement surgery. . . . He did say that he had no evidence to indicate that [Dr.] Elkus did not cut it into two pieces."
Zaden's attorney concluded the memorandum by remarking "I think the missionary work I did was pretty good."
At trial, Dr. Elkus and the two orthopedic surgeons he called as experts testified that Dr. Elkus had followed the correct surgical technique and procedures in operating on Zaden's hip. The two surgeons also testified that injury to the sciatic nerve during hip-replacement surgery, whether by bruising, stretching, or partial or complete transection, is a known risk of that type of surgery. Corroborating medical literature was introduced. An orthopedic surgeon Zaden presented as her nontreating medical expert conceded that bruising, stretching, and partially resecting the sciatic nerve during hip-replacement surgery are all recognized and accepted risks of the procedure, but expressed the opinion that a complete transection represented a breach of the standard of care.
On April 19, 2002, the jury returned a verdict in favor of Dr. Elkus, and on that same day the trial court entered a judgment on that verdict. On May 17, 2002, Zaden filed a motion for a new trial, which, although stating in a concluding notation "please take notice that the foregoing motion is set for hearing before the Honorable Ed Ramsey on ____," left blank the date for any hearing on the motion. Dr. Elkus opposed the motion for a new trial. Among the materials Dr. Elkus filed with the court opposing the motion was a June 24, 2002, affidavit of Dr. Sanders, which read, in relevant part:
 "As part of [Zaden's] Motion for New Trial, [Zaden] contends that I changed my testimony at trial. This contention is absolutely wrong and without basis. *Page 1002 
My testimony at trial was consistent with my medical records for Ms. Zaden; information I gave to [Zaden's] attorney Frank Burge when I met with Mr. Burge on April 6, 2000 and later on April 4, 2002; testimony I gave at my deposition on August 9, 2001; and my testimony at trial.
 "I was first contacted about this case by Mr. Burge and agreed to meet with Mr. Burge on April 6, 2000. During the course of this meeting, Mr. Burge asked me about my opinions concerning the operation performed by Dr. Elkus on July 31, 1997 and the operation performed by me on November 30, 1998. We specifically discussed my operative finding that the sciatic nerve had been transected. I advised Mr. Burge that I did not believe that Dr. Elkus transected or cut the sciatic nerve on July 31, 1997. I referred Mr. Burge to my office notes of October 23, 1997, November 4, 1997, and December 18, 1997 wherein I described the nerve was most probably stretched as opposed to being cut or transected. (Attached as Exhibit `1'). At the time of the November 30, 1998 procedure, I could only determine that the nerve had become separated. I told Mr. Burge that there were many possible causes for the sciatic nerve to have been injured and later separated. I informed Mr. Burge that although I found that the nerve had been transected, I could not testify as to the exact cause of the transection.
 "Following my meeting with Mr. Burge on April 6, 2000, I was asked by [Zaden] to give a deposition and did so on August 9, 2001. During the deposition Mr. Burge asked my opinions concerning the scope of the surgeries of July 31, 1997 and November 30, 1998. As I had described to Mr. Burge on April 6, 2000, I again advised Mr. Burge that I did not believe the sciatic nerve had been transected by Dr. Elkus on July 31, 1997. I testified that there were many possible causes for the sciatic nerve to have been injured. During the course of the deposition, Mr. Burge introduced a memorandum he had prepared following our meeting of April 6, 2000. The memorandum correctly states in part, the opinion I gave Mr. Burge that `transection' meant only `separated' or `in two pieces' and that I did not believe Dr. Elkus had transected the nerve. A copy of Mr. Burge's memorandum was made Exhibit 2 to my deposition and is also attached hereto. (Attached as Exhibit `2').
 "Prior to trial, I met with Mr. Burge at his request on April 4, 2002. I reaffirmed to Mr. Burge my opinion that Dr. Elkus had not transected the nerve on July 31, 1997. I again explained to Mr. Burge the many possible causes for the nerve to have been injured and later found to have been transected.
 "The case was called to trial and I was asked by [Zaden] to testify on April 16, 2002. Mr. Burge again questioned me as to the injury to the sciatic nerve. I told Mr. Burge for the fourth time my opinion that I did not believe that Dr. Elkus transected the sciatic nerve. I confirmed that the nerve had been found to be separated when I operated in November, 1998. I stated that there were may possible causes for the nerve to have been injured during Dr. Elkus' surgery including but not limited to bruising, stretching, or by direct trauma from a reamer, retractor or sutures.
 "As part of [Zaden's] Motion for New Trial, [Zaden] refers to Taber's Medical Dictionary and the definition of transection. I agree Ms. Zaden's sciatic nerve was transected based upon my operative findings on November, 1998. I cannot, *Page 1003 
however, testify as to the exact cause of how the nerve became transected."
Cooper filed a motion to strike Zaden's motion for a new trial stating, among other things, that he had not represented any insurance carrier in Zaden's litigation and that he had represented Dr. O'Neal at the taking of his deposition. On July 2, 2002, the trial judge entered an order denying Cooper's motion to strike Zaden's motion for a new trial on the ground that Cooper was not an attorney of record and did not represent a party in the action. The trial court's order also stated, in pertinent part:
"2. [Zaden's] Motion for New Trial.
 "[Zaden] contends that there was improper contact by [Dr. Elkus's] attorneys with [Zaden's] healthcare providers. The Order by Judge Vowell[12] was cited by [Zaden] in support of a motion to compel [the] testimony of Dr. O' Neal. It appears to this Court that the questions undertook to inject insurance into the case. For that reason, the motion to compel additional testimony of Dr. O'Neal was denied.
 "[Zaden] never asked the Court to prohibit the attorneys for [Dr. Elkus] from talking with the witnesses.
". . . .
 "There was no evidence presented to the Court that the attorneys for [Dr. Elkus] had influenced any witness in their testimony.
 "For the foregoing reasons, [Zaden's] Motion for New Trial is denied."
Zaden then filed this appeal.
In the "Statement of the Issues" section of her brief to this Court, Zaden identifies her issues on this appeal as follows:
 "1. Patient sues her Doctor for negligently severing her nerve during surgery. The testimony of the subsequent doctors who found, tested, treated, and surgically repaired the damaged nerve is critical to the case. When two of these doctors are deposed, an attorney appears on their behalf. The same law firm later appears on behalf of a third witness doctor. The Patient's lawyers suspect that the Defendant Doctor or his malpractice insurance carrier hired this lawyer to influence the testimony of these doctors. The trial court, however, refuses to allow the patient's lawyers to ask any questions as to the nature of their relationship. Is this error?
 "2. Patient sues Doctor for transecting her sciatic nerve. Treating physician discovering `transected' sciatic nerve meets ex parte with Doctor's attorneys and liability insurance company. Physician testifies at trial the sciatic nerve was not transected. Doctor's attorneys and liability insurance company meet ex parte with Patient's other treating physicians. These physicians mysteriously align with Doctor's theory of the case. Patient seeks discovery regarding extent of ex parte contacts. Trial court denies discovery. Is this error?"
 II. Standard of Review
"We recently summarized our standards regarding review of a trial court's discovery order:
 "`Discovery requests are governed by Rule 26, Ala. R. Civ. P. However, "[d]iscovery matters are within the trial court's sound discretion, and its ruling on those matters will not be reversed absent a showing of abuse of discretion and substantial harm to the appellant." Wolff v. Colonial Bank, 612 So.2d 1146, 1146 (Ala. 1992) (citations omitted). . . .'" *Page 1004 Ex parte McFadden Eng'g, Inc., 835 So.2d 996, 1002
(Ala. 2002). See also Coastal Lumber Co. v. Johnson, 669 So.2d 803 (Ala. 1995); Ex parte Harwell, 639 So.2d 1335 (Ala. 1993). "This Court has on many occasions held that the trial courts have very broad discretion regarding discovery matters under Rule 26, Ala.R.Civ.P." Hunt v. Windom, 604 So.2d 395, 397 (Ala. 1992).
 III. Analysis
Initially, we note that Zaden could have sought relief on these issues before trial by filing a petition for a writ of mandamus. "`Petitioning for the writ of mandamus is the proper method for determining whether a trial judge has abused his discretion in limiting discovery.' Ex parte Allstate Ins. Co.,401 So.2d 749, 751 (Ala. 1981)." Ex parte Maple Chase Co.,840 So.2d 147, 149 (Ala. 2002). See also Ex parte Pitts,822 So.2d 418, 421 (Ala. 2001); Ex parte Walker Reg'l Med. Ctr., Inc.,825 So.2d 741 (Ala. 2001); and Ex parte McFadden Eng'g, Inc., supra. However, we recently explained in Ex parte Ocwen FederalBank, 872 So.2d 810 (Ala. 2003):
 "Discovery matters are within the trial court's sound discretion, and this Court will not reverse a trial court's ruling on a discovery issue unless the trial court has clearly exceeded its discretion. Home Ins. Co. v. Rice, 585 So.2d 859, 862 (Ala. 1991). Accordingly, mandamus will issue to reverse a trial court's ruling on a discovery issue only (1) where there is a showing that the trial court clearly exceeded its discretion, and (2) where the aggrieved party does not have an adequate remedy by ordinary appeal. The petitioner has an affirmative burden to prove the existence of each of these conditions.
 "Generally, an appeal of a discovery order is an adequate remedy, notwithstanding the fact that that procedure may delay an appellate court's review of a petitioner's grievance or impose on the petitioner additional expense; our judicial system cannot afford immediate mandamus review of every discovery order. See Walker v. Packer, 827 S.W.2d 833, 842 (Tex. 1992) (`Mandamus disrupts the trial proceedings, forcing the parties to address in an appellate court issues that otherwise might have been resolved as discovery progressed and the evidence was developed at trial.'). In certain exceptional cases, however, review by appeal of a discovery order may be inadequate, for example, (a) when a privilege is disregarded, see Ex parte Miltope Corp., 823 So.2d 640, 644-45 (Ala. 2001) (`If a trial court orders the discovery of trade secrets and such are disclosed, the party resisting discovery will have no adequate remedy on appeal.'); (b) when a discovery order compels the production of patently irrelevant or duplicative documents, such as to clearly constitute harassment or impose a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party, see, e.g., Ex parte Compass, 686 So.2d 1135, 1138 (Ala. 1996) (request for `every customer file for every variable annuity' including annuity products the plaintiff did not purchase); (c) when the trial court either imposes sanctions effectively precluding a decision on the merits or denies discovery going to a party's entire action or defense so that, in either event, the outcome has been all but determined, and the petitioner would be merely going through the motions of a trial to obtain an appeal; or (d) when the trial court impermissibly prevents the petitioner from making a record on the discovery issue so that the appellate court cannot review the effect of the trial court's alleged error. The burden rests on the petitioner to demonstrate *Page 1005 
that its petition presents such an exceptional case — that is, one in which an appeal is not an adequate remedy. See Ex parte Consolidated Publ'g Co., 601 So.2d 423, 426 (Ala. 1992)."
872 So.2d at 813-14 (footnote omitted).
Zaden contends that the trial court committed reversible error by preventing her from conducting discovery of the existence of liability insurance for the purpose of showing that Dr. Elkus's medical-liability insurer was providing lawyers to her treating physicians who were deposed, thereby raising an inference of witness bias. "The presence of insurance coverage is not ordinarily permitted to be injected into the trial of the case."Welborn v. Snider, 431 So.2d 1198, 1201 (Ala. 1983) (citingBarnes v. Tarver, 360 So.2d 953, 956 (Ala. 1978); Eathorne v.State Farm Mut. Auto. Ins. Co., 404 So.2d 682 (Ala. 1981); andSars, Inc. v. Nichols, 275 Ala. 17, 151 So.2d 739 (1963)). However, "[t]he trial court has discretion to admit evidence to show bias, prejudice, or interest of a witness." Osborne v.Cobb, 410 So.2d 396, 398 (Ala. 1982) (citing Insurance Co. ofNorth America v. Mays, 278 Ala. 20, 174 So.2d 700 (1965), andWilliams v. State, 44 Ala.App. 503, 214 So.2d 712 (1968)).
In support of her contention Zaden argues, among other things, that Rule 26(b)(1), Ala.R.Civ.P., allows discovery of any matter relevant to the subject matter of the action; thus, she says, the trial court erred by deciding a discovery issue on the basis of Rule 403, Ala.R.Evid., governing the admissibility of evidence at trial. The first paragraph of Rule 26(b)(1) states:
 "(1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."
In Ex parte AMI West Alabama General Hospital, 582 So.2d 484,485-86 (Ala. 1991), we explained:
 "This rule contemplates a broad right of discovery. Discovery should be permitted if there is any likelihood that the information sought will aid the party seeking discovery in the pursuit of his claim or defense. Discovery is not limited to matters that would be admissible as evidence in the trial of the lawsuit. Ex parte Dorsey Trailers, Inc., 397 So.2d 98 (Ala. 1981)."
"A trial judge, who has broad discretion in this area, should nevertheless incline toward permitting the broadest discovery and utilize his discretion to issue protective orders to protect the interests of parties opposing discovery." 582 So.2d at 486.
In order for the matter to be discoverable, the information sought must also be relevant. "`Relevancy,' as used in our discovery rules, means relevant to the subject matter of the action; evidence is relevant if it affords a reasonable possibility that the information sought will lead to otherevidence that will be admissible. Ex parte Dorsey Trailers, [397 So.2d 98 (Ala. 1981)]; Drewes v. Bank of Wadley, 350 So.2d 402
(Ala. 1977); 8 Wright and Miller, Federal Practice andProcedure § 2008 (1970)." Plitt v. Griggs, 585 So.2d 1317, *Page 1006 
1321 (Ala. 1991) (emphasis supplied). See also Ex parte Thomas,628 So.2d 483, 485 (Ala. 1993).
Rule 403, Ala.R.Evid., on the other hand, states:
 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
In Leaffer v. Zarlengo, 44 P.3d 1072 (Colo. 2002), the Supreme Court of Colorado addressed an issue similar to the one presented here. In Leaffer, a patient and her spouse sued her obstetrician/gynecologist ("the doctor") and other named defendants, alleging inadequate prenatal care, resulting in the death of the patient's baby and physical and emotional harm to the patient. During the discovery stage of the case, the patient filed a motion to compel, among other things, the production of the doctor's "office calendar and/or appointment books" for a four-month period, with the names of her patients, other than the patient, redacted. The patient sought to show that the doctor had "competing obligations" that could have resulted in the alleged inadequate care. The trial court denied the patient's motion to compel, and she petitioned the Colorado Supreme Court for a writ of mandamus. Granting the writ and holding that the patient was entitled to discover the doctor's appointment calender, that court stated in a footnote:
 "Alternatively, [the doctor] argued that even if the calendar is relevant, it should be excluded because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, and a waste of the court's time under [Colorado Rules of Evidence] 403[13] because [the patient] seeks to portray [the doctor] as a `careless physician' who is `too busy' to care for his patients. However, CRE 403 has no bearing on the discoverability of evidence under the broad standard set forth in [Colorado Rules of Civil Procedure] 26(b)(1).[14] C.R.C.P 26(b)(1) specifically provides that the information sought need not be admissible at trial if it `appears reasonably calculated to lead to the discovery of admissible evidence.' C.R.C.P. 26(b)(1); see also, Shelia K. Hyatt Stephen A. Hess, Colorado Civil Rules Annotated, 386 (3d ed. 1998) (`[D]iscovery is not bound up in evidentiary rules applicable at trial. . . .')."
44 P.3d at 1083 n. 11 (emphasis added).
This explanation regarding the correlation between Colorado's evidentiary Rule 403 and Rule 26 of its Rules of Civil Procedure, its discovery rule, is persuasive in recognizing a similar correlation between the counterpart rules in this state. Matter that is "relevant" under Rule 26, Ala.R.Civ.P., is discoverable, subject to the various limitations stated in that rule and other of the discovery rules collected as Rules 26 through 37, Ala.R.Civ.P. Matter that is discoverable has no immediate status as "evidence." Whether it will become evidence, by presentation to the fact-finder for its consideration, depends on the application of the many evidentiary rules, including Rule 403. Under that rule, evidence offered for admission, even thoughrelevant, may nonetheless be excluded through a weighing process. However, the issue presented by Zaden is an issue of her right to discover information governed *Page 1007 
by Rule 26, Ala.R.Civ.P.; thus, the trial court "jumped the gun" in applying the evidentiary standard of Rule 403, Ala.R.Evid., to a discovery issue governed by Rule 26, Ala.R.Civ.P.
The proper test under Rule 26 is whether the information sought for discovery is "relevant" within the meaning of that rule. As noted, discovery of certain information is relevant at that stage even though that information is not admissible at trial if there is the reasonable possibility that the information will lead to other information that will be admissible as evidence at trial. Two questions Zaden argues Dr. O'Neal should have been compelled to answer are not "relevant" under that standard because they sought to explore a possible overlap of professional liability carriers for Dr. O'Neal and Dr. Elkus. Those two questions were: "Do you know whether or not your liability insurance is the same as the company that represents Mr. Elkus?" and "Do you know who your insurance is with?" Those questions would not lead to "other evidence that will be admissible," Plitt v. Griggs, supra (emphasis added), because, even assuming that it might have been shown that Dr. O'Neal and Dr. Elkus both had liability insurance and that it was with the same insurance carrier, that information would not have been admissible at trial.
In order for evidence of alleged bias based upon a relationship between a witness and a medical-liability insurer to be admissible at trial, the witness must have a "sufficient connection" with the liability insurance carrier to justify the admission of the relationship as a means to challenge the credibility of the witness. See Otwell v. Bryant, 497 So.2d 111
(Ala. 1986) (fact that defendant doctor's expert witness was insured by the same medical-liability insurer as was the defendant doctor was not a "sufficient connection" to challenge the credibility of the witness and to allow the issue of insurance to be interjected into the case to establish bias) See also Pattillo v. Sanchez, 614 So.2d 443 (Ala. 1993) (trial court properly refused to allow plaintiff to question defendant doctor's expert witnesses regarding their ownership of stock in the insurance company that defended defendant doctor because of the lack of sufficient connection between witnesses and insurer);Brackett v. Coleman, 525 So.2d 1372 (Ala. 1988) (trial court did not err in granting defendant doctor's motion in limine to prevent plaintiff from asking defendant's expert witness whether he was insured by same malpractice liability insurer as defendant doctor).
Furthermore, the questions asked of Dr. O'Neal that are at issue were posed to show the possibility of bias arising from the assumed fact that Dr. O'Neal and Dr. Elkus were covered by the same liability insurance carrier. Zaden argues that the trial court erred because there is a possibility that the answers to those questions would have raised an inference of bias. An indispensable element of the predicate for such a possible
showing of bias would be the identity of Dr. Elkus's medical-malpractice insurer. As noted, the record is devoid, as far as we can detect, of any information on that score. Whether, and by what insurer, Dr. Elkus had insurance coverage for Zaden's claims against him would have been readily discoverable under Rule 26(b)(2), Ala.R.Civ.P. That discovery approach was not used, however, as far as the record reveals. Without some evidence indicating the identity of Dr. Elkus's liability insurance carrier, there is no showing that an answer by Dr. O'Neal stating the identity of his carrier would have raised an inference of bias.
In this appeal, our review is limited to the material in the record that was before the trial court. "[T]his Court *Page 1008 
is limited to a review of the record alone, that is, it can consider only the evidence that was before the trial court when it made its ruling. King v. Garrett, 613 So.2d 1283 (Ala. 1993); Moody v. Hinton, 603 So.2d 912 (Ala. 1992)." Cowen v.M.S. Enters., Inc., 642 So.2d 453, 454-55 (Ala. 1994). While the record reflects instances where Zaden asserted that Dr. Elkus was insured by MASA, we found no instance where the identity of Dr. Elkus's medical-malpractice insurer was actually established. The party seeking to place the trial court in error must establish in the record an adequate predicate for our review. Cooper Co. v.Lester, 832 So.2d 628 (Ala. 2000); Alfa Mut. Gen. Ins. Co. v.Oglesby, 711 So.2d 938 (Ala. 1997). In this case, Zaden made no showing that Dr. Elkus was insured by MASA. For all of these reasons, we conclude that the trial court did not err by refusing to compel Dr. O'Neal to answer the two questions.
The three remaining questions posed to Dr. O'Neal — (1) "Did you hire the gentleman here — the lawyer here, that's representing you today?"; (2) "Are you the person that's going to pay the lawyer that's with you here today, Doctor?"; and (3) "How did you come to meet the gentleman, the lawyer here, that's representing you here today?" — do not directly raise an insurance issue. However, we have no basis for assessing the error, if any, in the trial court's refusal to require Dr. O'Neal to answer those questions. Zaden has failed to supply us with any means for review. Specifically, Zaden did not make any preverdict offer of proof concerning her expected answers to the questions, nor did she attempt to develop any evidence concerning those questions in connection with her motion for a new trial. Although her new-trial motion did assert as error the trial court's refusal to permit her to require answers from Dr. O'Neal concerning the five questions, there is no indication that Zaden sought a hearing on her motion for a new trial, and nothing in the record indicates that a hearing was held on the motion. On the contrary, the record strongly implies that no hearing was held. Certainly, no evidence from any such hearing is referenced by either side. At a hearing, Zaden would have been able to seek to elicit testimony from Dr. O'Neal or Cooper, who had interjected himself into the new-trial proceedings by his motion to strike Zaden's motion for a new trial. See, e.g., JeffersonCounty v. Kellum, 630 So.2d 426 (Ala. 1993), and Bush v.Stanton, 273 Ala. 615, 143 So.2d 621 (1962) (discussing evidence to be presented to show juror misconduct); Industrial Chem. Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala. 1988) (discussing the presentation of evidence in support of a motion for new trial on the ground of an excessive damages award).
Moreover, we note that the basis relied on by the trial court for its refusal to permit the questions to be answered before trial, i.e., the prejudice that would result from interjecting insurance into the trial, would have no application in a hearing on Zaden's motion for a new trial. A properly requested and conducted evidentiary hearing on the motion for a new trial would have provided the trial judge with an opportunity to hear evidence free from his preexisting concern regarding the prejudicial effect that evidence might have had upon a jury, and would have provided this Court with a basis for review and facts from which to consider the sufficiency of any evidence of alleged witness bias. If the trial judge had then blocked the attempted elicitation from witnesses of relevant posttrial testimony, then any error in that regard could be presented to this Court for review. As it is, we are left to speculate whether the trial judge would have allowed the presentation of testimony *Page 1009 
relevant to the matters at hand, and what that testimony would have revealed.
The law is settled that it is the appellant's duty to ensure that the appellate court has a record from which it can conduct a review. Cooper Co., supra; Oglesby, supra; and Gotlieb v.Collat, 567 So.2d 1302 (Ala. 1990). Further, in the absence of evidence in the record, this Court will not assume error of the part of the trial court. Browning v. Carpenter, 596 So.2d 906
(Ala. 1992); Smith v. Smith 596 So.2d 1 (Ala. 1992); Totten v.Lighting Supply, Inc., 507 So.2d 502 (Ala. 1987). Not only will this Court refuse to place the trial court in error for denying a motion for a new trial on a ground that is unsupported by evidence, Bush v. Stanton, 273 Ala. 615, 143 So.2d 621
(1962); Meeks v. State, 697 So.2d 60 (Ala.Crim.App. 1996), it will also decline to take the extraordinary step of ordering a remand to elicit evidence that could have been sought in a hearing on a motion for a new trial. Accordingly, we will not reverse the judgment of the trial court and order a new trial (the only relief Zaden seeks) based on the trial court's refusal to permit Zaden to require Dr. O'Neal to answer those three questions.
Zaden's second argument is that the trial court erred by prohibiting her from conducting discovery regarding ex parte communications between counsel for Dr. Elkus, his medical-liability insurance company, and Zaden's treating physicians. As noted, Zaden phrases this issue in her statement of the issues as involving a situation where Dr. Elkus's "attorneys and liability insurance company meet ex parte with Patient's other treating physicians." There is no evidence indicating that any representative of the "liability insurance company" (presumed by Zaden to be MASA) met ex parte with any treating physician. In Romine v. Medicenters of America, Inc.,476 So.2d 51 (Ala. 1985), this Court had occasion to address ex parte communications between a plaintiff's treating physicians and counsel for a defendant doctor. In Romine, Edith Brooks experienced a series of health problems and associated hospitalizations. At one point, she was admitted to University of Alabama in Birmingham ("UAB") Medical Center, where she was treated by Dr. Frank Bonikowski. After being discharged from UAB, Brooks was admitted to Medicenter, an extended care facility, where she was treated by Dr. Jerry Lewis. Brooks was discharged from Medicenter, but shortly thereafter was again admitted to the hospital, where she died. Dorise Romine, her daughter, as administratrix of her estate, sued Medicenters of America, Inc., and Dr. Lewis, alleging negligence in the treatment and care of her mother.
At trial, Romine presented evidence tending to show that Brooks died as a result of a blood infection and malnutrition caused by negligent treatment by Dr. Lewis. He presented contrary evidence tending to show that Brooks had been properly cared for and that her death resulted from other causes. Dr. Lewis presented the deposition testimony of Dr. Bonikowski. During that deposition, Dr. Bonikowski had been questioned about previous contacts he had had with counsel for Dr. Lewis and testified that he had spoken with counsel for Dr. Lewis approximately three times, although he did not have any authorization that allowed him to discuss Brooks's case with Dr. Lewis's attorney. The jury returned a verdict in favor of Dr. Lewis; Romine then appealed to this Court.
On appeal, Romine argued that Dr. Bonikowski's deposition testimony was inadmissible because he had had unauthorized contacts with Dr. Lewis's attorney before his deposition was taken. Holding that *Page 1010 
Dr. Bonikowski's deposition testimony was not inadmissible as a result of those contacts, this Court explained:
 "In Doe v. Eli Lilly Co., 99 F.R.D. 126 (D.D.C. 1983), the court, construing the Federal Rules of Civil Procedure, stated:
 "`As a general proposition, however, no party to litigation has anything resembling a proprietary right to any witness's evidence. Absent a privilege no party is entitled to restrict an opponent's access to a witness, however partial or important to him, by insisting upon some notion of allegiance. See International Business Machines Corp. v. Edelstein, 526 F.2d 37, 41-44 (2d Cir. 1975); Gregory v. United States, 369 F.2d 185, 187-88 (D.C. Cir. 1966); Edmund J. Flynn Co. v. LaVay, 431 A.2d 543, 551
(D.C. 1981); 8 J. Wigmore, Evidence § 2192 (McNaughton rev. ed. 1961). Even an expert whose knowledge has been purchased cannot be silenced by the party who is paying him on that ground alone. Unless impeded by privilege an adversary may inquire, in advance of trial, by any lawful manner to learn what any witness knows if other appropriate conditions the witness alone may impose are satisfied, e.g., compensation for his time and expertise or payment of reasonable expenses involved, and while the Federal Rules of Civil Procedure have provided certain specific formal methods of acquiring evidence from recalcitrant sources by compulsion, they have never been thought to preclude the use of such venerable, if informal, discovery techniques as the ex parte interview of a witness who is willing to speak. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); see International Business Machines Corp. v. Edelstein, 526 F.2d at 43-44; cf. Gregory v. United States, 369 F.2d at 187-88; Trans-World Investments v. Drobny, 554 P.2d 1148, 1151-52 (Alaska 1976).
 "`The potential for influencing trial testimony is inherent in every contact between a prospective witness and an interlocutor, formal or informal, and what a litigant may justifiably fear is an attempt by an adversary at improper influence for which there are sanctions enough if it occurs. See Gregory v. United States, 369 F.2d at 188. And there are entirely respectable reasons for conducting discovery by interview vice deposition: it is less costly and less likely to entail logistical or scheduling problems; it is conducive to spontaneity and candor in a way depositions can never be; and it is a cost-efficient means of eliminating non-essential witnesses from the list completely.'
"99 F.R.D. at 128.
 "Although the record in the present case is silent as to what, if any, information was actually exchanged between Dr. Bonikowski and counsel for Dr. Lewis during their conversations, presumably these contacts were for the purpose of ascertaining whether Dr. Bonikowski, in fact, had any information or opinions relevant to the case. The plaintiff's counsel was notified of and was in attendance at the taking of the doctor's deposition. Accordingly, we find no error on the part of the trial court in denying the plaintiff's pre-trial motion to exclude Dr. Bonikowski's testimony."
476 So.2d at 55. See also Mull v. String, 448 So.2d 952 (Ala. 1984).
In the instant case, the trial court's order denying Zaden's motion for a new trial declares that Zaden never requested that the trial court prohibit Dr. *Page 1011 
Elkus from having any ex parte communications or interviews with any of her treating physicians. Zaden does not challenge that statement. Zaden's only reference in the trial court to ex parte communications, other than in her motion for a new trial, was in her "Memorandum Brief In Support of Plaintiff's Motion To Compel Testimony Of Dr. David O'Neal." Under the sub-heading "VII. ExParte Communications Between a Defendant Doctor's Insurance Representative or Attorney and a Plaintiff's Treating Physician [are] not Permissible Under Alabama Laws of Discovery," she argued the import of the "Protective Order" Judge Vowell had entered a little over a year earlier in a case then pending before him styled Ballew v. Eagan (see note 7), quoting extensively from it and attaching a copy of it. Of course, one circuit judge's exercise of discretion concerning discovery matters is in no way binding on another judge of that circuit; moreover, we note the following contextual differences between that case and this one. The plaintiff in that medical-malpractice case sought a protective order alleging that the defendant doctors "either through their attorneys or representatives of their insurance carrier, Medical Association of the State of Alabama (MASA), have engaged in ex parte discussions" with the plaintiff's treating physicians. They sought an order prohibiting "further such ex parte contacts" (emphasis supplied). The order later explained: "The interview was conducted by a MASA representative." Judge Vowell ordered that the defendant doctors "individually, through counsel or their liability insurance representatives, shall not conduct any ex parte conferences or informal interviews with the decedent's health care providers," relegating them to discovery devices provided in the Alabama Rules of Civil Procedure. No condemnation of the already conducted conferences or interviews was expressed. Nowhere in her motion did Zaden request the trial court to prohibit ex parte communications. Her position concerning ex parte interviews was expressed to the trial judge solely in terms of Judge Vowell's order in Ballew, dealing with interviews ex parte by an attorney representing a defendant doctor, or by a representative of that doctor's medical-liability insurance carrier.
In her principal brief to this Court, Zaden identifies the denied "discovery regarding the extent of ex parte contacts," as she described it in her statement of this issue, by stating the following:
 "By seeking to compel the testimony of Dr. O'Neal and filing the notice of taking the deposition of witnesses' attorney, Ms. Zaden also sought to discover information regarding the extent of ex parte meetings between Dr. Elkus's attorneys, Dr. Elkus's liability insurance company and the witness/treating physicians. As stated to the trial court in her Motion for New Trial, Ms. Zaden requested a new trial because of `[T]he Court's allowing the Defendant's attorneys and the Defendant's liability insurance carrier's attorneys to coach witnesses in the case and denying the Plaintiff's efforts to determine the extent of such coaching.'"
Still later in that brief Zaden contends:
 "Here, the law firm that appeared on behalf of three subsequent treating physicians is known to have represented Dr. Elkus's liability insurance carrier. Not only were ex parte contacts engaged in between this attorney and Ms. Zaden's treating physicians, but Dr. Elkus's own attorneys admit to ex parte contact with several of Ms. Zaden's treating physicians."
As noted earlier, regardless of what counsel for Zaden may himself know about the identity of a liability insurance carrier *Page 1012 
for Dr. Elkus, that information appears nowhere in the record and is not the sort of fact of which we could take judicial notice. As Zaden goes on to make clear in her briefs, the discovery she sought, and that she says she was wrongfully denied, related only to "ex parte contact" by Cooper. Zaden does not contend that he was not the attorney for either Dr. Salmon or Dr. O'Neal, she merely suspects that he was provided for them by MASA. We cannot agree that a "contact," "interview," or "conference" between an attorney and his or her client can be viewed as an "ex parte" communication. If such communications were not conducted privately, a waiver of the attorney-client privilege would likely occur under Rule 510, Ala. R. Evid.
Zaden never sought any discovery from any source concerning the nature or content of any ex parte interview with any of Zaden's treating physicians by counsel for Dr. Elkus and never sought the trial court's intervention to prohibit or limit such interviews. "Any errors committed by the trial court must be affirmatively demonstrated by the record filed in this court, and if it does not disclose the facts upon which the alleged error is based, we will not consider that issue." Teng v. Diners Club, Inc.,424 So.2d 629, 629-30 (Ala.Civ.App. 1982) (citing Green v. StandardFire Ins. Co. of Alabama, 398 So.2d 671 (Ala. 1981)).
Notwithstanding her failure to request the trial court to enter an order instructing counsel for Dr. Elkus to abstain from conducting ex parte interviews with her treating physicians, Zaden attempts to place a negative connotation on the ex parte meetings that took place, characterizing them as "backroom dealings" that resulted in coercion and impropriety and that unduly influenced the testimony of Zaden's treating physicians who were called as witnesses. However, our review of the record discloses no evidence of any improper or coercive conduct on the part of Dr. Elkus's attorneys during the ex parte meetings. In fact, Dr. Sanders states in his previously mentioned affidavit, regarding his contact with defense counsel, "that [n]either Mr. Mackenzie[15] or Mr. Bates coached or attempted to influence my testimony in any manner." Additionally, in affidavits filed by Mackenzie and Bates, respectively, in opposition to Zaden's motion for a new trial, each stated, "I did not and would not coach, manipulate or otherwise attempt to influence the testimony of any physician I met with in preparation for this case."
The assertion in the second of Zaden's statement of the issues that the ex parte communication with Dr. Sanders involved not only counsel for Dr. Elkus, but also a representative of Dr. Elkus's "liability insurance company," is not separately argued by Zaden in her briefs to this Court and, as noted, finds no support in the record. Dr. Sanders was questioned by Zaden at trial regarding his ex parte interview with Dr. Elkus's counsel but was asked only whether he had participated in the interview with medical authorization from Zaden to do so, to which Dr. Sanders responded "No." At that point, counsel for Zaden could have pursued further the matter of the ex parte interview, but he chose not to do so. Moreover, as noted in Dr. Sander's deposition and his subsequent affidavit, counsel for Zaden had his own ex parte interviews with Dr. Sanders on April 6, 2000, and April 4, 2002, those occasions being both before and after Dr. Elkus's counsel interviewed Dr. Sanders. No "change" in Dr. Sanders's opinions has been shown to have occurred after his meeting with defense counsel. The law of *Page 1013 
this State is settled that ex parte communications under circumstances such as those presented by this case are allowable.Romine, supra.
In summary, there was no showing that Zaden sought any discovery concerning ex parte interviews between Dr. Elkus's counsel and Zaden's treating physicians or that she was denied any such discovery and there was no showing to the trial judge of any impropriety during those interviews. To the extent Zaden attempts to characterize Cooper's communications with his clients Dr. Salmon and Dr. O'Neal as "ex parte contacts," we reject that characterization as stretching the concept of ex parte communications.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
HOUSTON, SEE, LYONS, BROWN, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., dissents.
[1] Dr. Elkus testified at trial, however, that Zaden experienced some sensation in her left foot following her surgery.
[2] In his deposition testimony, Dr. Salmon described the sciatic nerve only as a long nerve that extends down a person's leg and "branches out down the line." Webster's New WorldMedical Dictionary (2d ed. 2003) describes the sciatic nerve as follows: "The largest nerve in the body, the sciatic nerve begins from nerve roots in the lumbar part of the spinal cord (in the low back) and extends down through the buttock area to send nerve endings down the legs."
[3] Dr. Sanders explained in his testimony that a neurolysis is where "we dissect the nerve from the scar tissue or tissue that may be surrounding the nerve."
[4] "Sural" means "relating to the calf of the leg." Stedman'sMedical Dictionary (27th ed. 2000).
[5] Dr. Salmon stated in his deposition that he had served one year out of a four-year residency in neurology in 1978 or 1979, but that he had never practiced neurology.
[6] We can take judicial notice that those initials were originally an acronym for "Mutual Assurance Society of Alabama." See Otwell v. Bryant, 497 So.2d 111, 113 (Ala. 1986). We can further take judicial notice that MASA, a mutual company, converted to a stock company and was renamed Mutual Assurance, Inc., and on May 20, 1999, the company's name was again changed, to "The Medical Assurance Company, Inc." See Ex parte MedicalAssurance Co., 862 So.2d 645, 647 n. 1 (Ala. 2003).
[7] A protective order issued by Judge Scott Vowell, a circuit court judge in Jefferson County, in the case Ballew v. Eagan, CV-00-6528, a wrongful-death action brought under the Alabama Medical Liability Act appears on that page of the record. In his order, Judge Vowell disallowed any ex parte communications between defense counsel or insurance investigators and the treating physicians of the deceased patient, who were believed to have been insured by MASA.
[8] "Neurapraxia" is defined as "an injury to a nerve that interrupts conduction causing temporary paralysis but not degeneration and that is followed by a complete and rapid recovery." Merriam-Webster's Medical Dictionary (2002).
[9] At that meeting, as attested to in a posttrial affidavit by counsel for Dr. Elkus, Dr. Sanders was questioned only as to the care and treatment Dr. Elkus provided and/or Zaden's condition and future prognosis.
[10] During the trial, Dr. Elkus's expert witnesses, Dr. James Davis and Dr. James Floyd, both of whom are orthopedic surgeons, testified that they did not believe, based on the sensations Zaden was experiencing in her left foot after the hip-replacement surgery, that Dr. Elkus had completely transected Zaden's sciatic nerve.
[11] Zaden asserts in her reply brief that the timing of the meeting between defense counsel and Dr. Sanders vis-a-vis the meeting her own counsel had with Dr. Sanders, is not established, and she queries, "Had Dr. Elkus's attorneys or attorney Cooper met with Dr. Sanders before Ms. Zaden's attorney and discussed with Dr. Sanders his definition of `transected' sciatic nerve?" However, Dr. Sanders clearly states in his posttrial affidavit that when he met with the attorneys for Dr. Elkus he advised them "of the same opinion that he had previously given to [Zaden's attorney]." (Emphasis supplied.)
[12] See note 7.
[13] Rule 403, Colo.R.Evid., is identical to Rule 403, Ala.R.Evid.
[14] Rule 26(b)(1), Colo.R.Civ.P., is substantially similar to Rule 26(b)(1), Ala.R.Civ.P.
[15] Robert P. MacKenzie III, another member of the law firm of Starnes Atchison.