MURDOCK, Justice
(dissenting as to case no. 1141230 and concurring in the result as to case no. 1141267).
As to the cross-appeal of Scottsdale Insurance Company, I concur in the result as to the issue whether Har-Mar Collisions, Inc., is entitled to recover under the Scottsdale Insurance Company policy. I write specially to explain where my rationale varies from that offered in the main opinion and to address the issue of “standing” raised by Scottsdale in its appellate brief.
As to the appeal of Har-Mar Collisions, Inc., I respectfully dissent for the reasons hereinafter stated.

A, Scottsdale’s cross-appeal: case no. mm?

As the main opinion notes, the Restatement (Second) of Contracts § 152 (1981) defines a “mutual mistake of fact” as “ ‘a “mutual misunderstanding concerning a basic assumption on which the contract was made.” ’ ” 212 So.3d at 899 (quoting EBSCO Indus., Inc. v. Royal Ins. Co. of America, 775 So.2d 128, 131 (Ala.2000), quoting in turn Finley v. Liberty Mut. Ins. Co., 456 So.2d 1065 (Ala.1984)). I do not find that the circumstance presented in this case involving the misnaming of the named insured falls within this definition. The result reached by the main opinion is nonetheless correct, in my view, on the ground that the reference in the insurance *907 policy to “Har-Mar, Inc.,” as the named insured is a latent ambiguity, because no such company exists, and that the trial court correctly discerned on the basis of parol evidence that the intent of the parties was for the insurance policy to insure Har-Mar Collisions, Inc,
I take this opportunity as well to express my concern regarding the framing by Scottsdale of one of its arguments in this case as a “standing” argument. Essentially, Scottsdale argues that Har-Mar Collisions, Inc., because it is not the named insured, lacks “standing” to bring its claims. That is not the case. The issue, were it not mooted as explained in the main opinion, would not be one of “standing” but simply whether Har-Mar Collisions, Inc., had a cognizable claim against Scottsdale under the applicable facts and law. As this Court explained in Ex parte BAC Home Loans Servicing, LP, 159 So.3d 31 (Ala.2013):
“[T]he concept of standing is used to differentiate between those complaints regarding governmental action that are shared generally by the citizenry and that therefore must be addressed politically and those complaints that reflect a sufficient specific injury and consequent adverseness to make for a ‘case’ that is within the purview of the judicial branch. Accordingly, the concept appears to have no necessary role to play in respect to private-law actions, which, unlike public-law cases (for example, a suit against the Secretary of Interior to construe and enforce an environmental regulation designed to protect wildlife), come with established elements that define an adversarial relationship and ‘controversy’ sufficient to justify judicial intervention. In private-law actions (e.g., a claim of negligence or, as here, a statutory claim for ejectment), if the elements are met, the plaintiff is entitled to judicial intervention; if they are not met, then the plaintiff is not entitled to judicial intervention. Everything necessary to justify judicial intervention, by definition, inheres in those elements that we say constitute a ‘cause of action’ in and by our courts.... At a very fundamental level, the concept of standing is already embodied in the various elements prescribed, including the common requirement of proof of a sufficient existing or threatened injury.
“Professors Wright and Miller are just two of the commentators who have recognized that the concept of standing was formulated by the United States Supreme Court in the field of ‘public law—constitutional or other challenges to the actions of officials or administrative agencies—and is out of place in private-law cases,”
159 So.3d at 44 (referencing 13A Charles Alan Wright, Arthur K. Miller, and Edward H. Cooper, Federal Practice & Procedure § 3531 (2008)) (emphasis added); see also Whitty v. Montgomery Cty., 141 So.3d 1015, 1021 (Ala.2013) (noting that, in BAC, “this Court rejected the notion that questions such as those raised by the defendants ... present a ‘standing’ issue rather than a ‘cause of action’ issue”).
This is not the first time since this Court’s decision in BAC that counsel in a case before this Court has presented a brief making a “standing” argument that fails to account for our recent precedents as to the inapplicability of “standing” to private-law actions. I encourage members of the bench and bar to be mindful of those precedents.

B. The appeal of Har-Mar Collision, Inc.: case no. 11⅛1%30

As to the money judgment against Scottsdale in favor of Har-Mar Collisions, Inc. (hereinafter referred to as “Har- *908 Mar”), I respectfully disagree with the conclusion in the main opinion that Scottsdale was not entitled to a setoff in the amount of the settlement payment made by Auto-Owners Insurance Company and Owners Insurance Company (hereinafter referred to as “Auto-Owners”) to Har-Mar. The main opinion relies for this conclusion on Alabama Farm Burean Mutual Casualty Insurance Co. v. Williams, 530 So.2d 1371 (Ala.1988). I submit that Williams provides an incomplete, if not inaccurate, statement of the law as to set-off and that that case is distinguishable from the present case in any event.
To begin, I disagree with the generalized denigration of the single-injury theory that I read in the 1988 opinion of this Court in Williams and with the main opinion’s reliance on, or embracement of, the Williams Court’s suggestion that the fact of a single injury is no basis for disallowing additional or double recovery by a plaintiff. As a general rule, I believe our jurisprudence should, and actually does, take heed of the fact that a plaintiff suffering from a single, indivisible injury may not recoup a windfall of more than the amount of his or her injury by recovering from multiple defendants for the same loss. Thus it is that a joint tortfeasor is entitled to a setoff or credit of another joint tortfeasor’s payments to the plaintiff for the same injury.
“Appellant on rehearing states the proposition as follows:
“ ‘In view of Alabama law which permits no right of contribution among joint tort-feasors the plaintiff is at liberty to execute against either defendant and the other defendant has no right to set off or claim a credit by way of contribution.’
“This statement is not a correct statement of the law of contribution between joint tort-feasors. This principle is only applicable to an action to enforce contributions between the joint tort-feasors. It is entirely inaccurate to say that a joint tort-feasor cannot claim credit as against the plaintiff for any sums paid her by another joint tort-feasor.
“A plaintiff may not sue tort-feasors jointly, recover judgment against both and recover the full amount of the judgment from both. Such plaintiff may recover for her single injwy, though proximately caused by joint tort, only once. If either tort-feasor pays the judgment, recovery may not be had from the other. This principle is made clear in the first paragraph of the opinion in the case cited by appellant—Gobble v. Bradford, 226 Ala. 517, 147 So. 619 [(1933)].
“The defense of no contribution as between joint tort-feasors is available only in actions seeking such contribution between such joint tort-feasors.”
Boles v. Steel, 48 Ala.App. 268, 272, 264 So.2d 191, 194 (Civ.App.1972) (emphasis added); see also, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 348, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) (“It is settled that entirely apart from any release, a plaintiff who has recovered any item of damage from one coconspirator may not again recover the same item from another conspirator; the law, that is, does not permit a plaintiff to recover double payment.”).
Similarly, two insurance companies insuring the same loss are afforded by law the right of pro rata contribution:
“If the policies of two insurance companies are in force at the date of the loss and the status of the two insurers is that of insurers of the same property of the same insured against the same hazard, they are each proportionately and severally liable for the loss at the ratio which the amount of their respective policies bears to the whole insurance covering *909 the property against the perils involved.”
Nationwide Mut. Fire Ins. Co. v. Wilborn, 291 Ala. 193, 200-01, 279 So.2d 460, 466 (1973). Resort to this general principle is typically unnecessary because, as in the present case, insurance companies normally expressly contract for the right to reduce loss payments to an insured based on payments the insured receives from other insurers for the same loss.
Even when an action pairs as defendants an insurer and an unrelated tortfeasor, the law provides the principle of equitable sub-rogation. See, e.g., McGuire v. Wilson, 372 So.2d 1297, 1300 (Ala.1979) (‘“The general rule is that when an insurer pays the insured in accordance with the insurance contract for a loss of property proximately resulting from fire caused by the actionable misconduct of a third party, the insurer becomes, by the doctrine of equitable subrogation, the owner, pro tanto, of the claim of the insured against the third party.... The equity of such principle is said to be that the insured has only one claim and is entitled to one payment only, and that the loss should ultimately fall on the third party who caused it.’ ” (quoting City of Birmingham v. Walker, 267 Ala. 150, 154, 101 So.2d 250, 252 (1958))). Here too, of course, resort to the relief afforded by the law (in this case, equitable subrogation) is rarely necessary given the fact that most insurers include in their insurance policies express contractual provisions entitling them to subrogation rights vis-á-vis such a third party.
The problem in Williams is that there is no acknowledgment or discussion of the mechanism generally afforded by the law to prevent a double recovery as to a single injury as between an insurer and a third-party tortfeasor, i.e., subrogation. And absent a contractual provision in the Farm Bureau policy allowing Farm Bureau to reduce its loss payment by way of setoff of amounts paid by the third-party tortfeasor, the result in Williams may have been correct.
But even to the extent Williams may have correctly discussed the pertinent law applicable to the facts of that case, Williams did not purport to address under what circumstances an insurance company is entitled to a setoff or credit for payments made by another insurance company. Williams involved claims against a single insurance company under a contract of insurance and a tortfeasor, the plaintiffs’ mortgage company.
In Williams, the Williamses’ fire-insurance policy with Farm Bureau lapsed because their mortgagee, First Federal Savings and Loan Association of Jasper, failed to pay the policy premiums from the insurance-premium escrow First Federal had collected from the Williamses. First Federal ceased paying the premiums after Jimmy Holderfield, an agent for Farm Bureau, advised First Federal to cease paying the premiums until he advised it differently. Thereafter, in violation of First Federal’s internal policies, it failed to ascertain whether the Williamses’ home had fire-insurance coverage. The Williamses continued to make escrow payments to First Federal that included amounts intended for use as premiums for fire insurance, but First Federal failed to pay those premiums to Farm Bureau. After the Williamses’ house was destroyed by fire, they filed an insurance claim with Farm Bureau; Farm Bureau denied coverage. The Williamses sued, alleging breach of contract and fraud against Farm Bureau and its agent, Holderfield, for failing to pay their loss claim and against First Federal alleging negligence and breach of contract in failing to pay the premiums on the policy when the premiums came due.
*910 Shortly before trial, First Federal was dismissed from the case pursuant to a pro tanto settlement agreement between the Williamses and First Federal. As a condition of the settlement, First Federal agreed to waive any claim it might have to any moneys to be recovered from Farm Bureau. The case went to trial against Farm Bureau, and the jury returned a verdict in favor of the Williamses on their breach-of-contract claim; the trial court subsequently entered a judgment against Farm Bureau in the amount of $74,800, plus interest. See 530 So.2d at 1372-73. Just as First Federal waived any claim to moneys to be paid by Farm Bureau, there is no mention in Williams of Farm Bureau’s pursuing a subrogation claim as to' the payments made by First Federal.
The issues in Williams were explained by the Court as follows:
“At trial, Farm Bureau made an offer of proof.... That offer ... showed that the pro tanto agreement released First Federal from liability ,,. for the sum of $46,337.06. First Federal agreed to apply that amount against the mortgage indebtedness it had outstanding on the Williamses’ property. The outstanding indebtedness at that time was $46,337.06, and thus, the mortgage debt was extinguished. Furthermore, First Federal disclaimed any interest in any proceeds recovered by the Williamses in their pending action against Farm Bureau and Holderfield. The trial court denied this offer of proof.
“Farm Bureau argues that it is entitled to plead and prove the existence of the pro tanto settlement in order to mitigate its liability. Appellant reasons that the liability and obligations of First Federal and itself are joint and, therefore, because the plaintiffs suffered only one injury, that it should be allowed to produce as evidence the fact of the partial satisfaction to mitigate or reduce the damages for which it ultimately may be found liable, just as in the case of joint tort-feasors. See generally, Williams v. Colquett, 272 Ala. 577, 133 So.2d 364 (1961); Steenhuis v. Holland, 217 Ala. 105, 115 So. 2 (1927).
“Appellees, the Williamses, argue that the obligations under the respective contracts of First Federal and Farm Bureau are separate and distinct. They conclude that the evidence of the pro tanto release was properly excluded because First Federal was not a party to the contract of insurance.
‘We are of the opinion that appellant’s joint liability theory must fail for the simple reason that there is no evidence that appellant and First Federal either undertook or assumed any joint obligation toward the Williamses. We agree with the Williamses that the obligations owing them from Farm Bureau and First Federal are separate and distinct. The evidence shows that Farm Bureau contracted with the Williamses to provide fire insurance on their house. On the other hand, the only obligation assumed by First Federal was to act as an escrow agent for the Williamses for the payment of the insurance premiums on their home. Furthermore, we do not accept appellant’s argument that if the breach of different contractual obligations produces only one injury then evidence of a pro tanto settlement agreement should be allowed into evidence. The appellant has not cited this Court to any authority to support such a proposition."
530 So.2d at 1373 (emphasis added).
Importantly, then, all that occurred in Williams is that this Court, in the face of an absence of cited authority to support its doing so, refused to allow a setoff of payments made by a third-party tortfeasor *911 against a sum an insurance company specifically obligated itself by contract to pay to the insured in the event of a particular type of loss.[10] Most importantly for present purposes, no issue was presented in Williams as to the propriety of a setoff between two insurance companies that had insured the Williamses against the same loss.[11]
In a case such as Williams, where an insurance company undertakes a specific contractual liability to the plaintiff in the event of a specified loss, if there is to be a safeguard against the insurance payment overlapping with moneys that might be received by the insured from a third party for that same loss, that safeguard is to be either subrogation, interposed either by law or by the terms of the insurance contract itself, or some other contractually agreed upon reduction in liability in the event of a payment by a third party of all or some of the same loss. And, as noted, I see no reference in Williams to the issue of subrogation or, in particular, any attempt by Farm Bureau in that case to invoke a subrogation right. Likewise as to protection against overlap, i.e., windfall, based on third-party payments, the insurer in Williams could have provided for a reduction in its liability based on any payment from a third party, whether in the form of a payment of the mortgage or otherwise. But no such policy provision is discussed in Williams.
In contrast to the relationship of the parties and the liabilities presented in Williams, the present case entails insurance-contract obligations of two insurance companies that issued policies that, to some extent, both undertake to provide insurance coverage to Har-Mar for the amount of rent it would owe Hartung Commercial Properties, Inc. (“Hartung”), in the event a fire caused by Har-Mar destroyed the premises Har-Mar leased from Hartung. See discussion, infra. In the situation, like here, where two insurance companies provide overlapping coverage, the law is different than the law applied in Williams. Of course, there well can be, and often are, express setoff or liability-reduction clauses in one or both of the policies. But even in the absence of express setoff provisions in a policy, the law overlays such an arrangement as noted above. See Nationwide Mutual Fire Insurance Co., supra. Moreover, as the main opinion notes, the Scottsdale policy in this case provides that, in the event there is a second insurance carrier (Auto-Owners in this case) as to a covered loss, the Scottsdale policy mil pay for only the amount of the loss that is in excess of the amount paid by the other insurance company. I therefore find Williams inappo-site.
Further, as to whether Har-Mar is entitled to reversal of the trial court’s judgment on the ground that Har-Mar did not obtain a double recovery based on overlapping coverage, I note that it cannot be determined what losses make up the $101,054.40 jury verdict at issue and that the inability to make that determination *912 must be laid at Har-Mar’s feet. Specifically, the jury’s verdict against Scottsdale appears to be attributable in substantial part, if not entirely, to the “business-income” coverage in the Scottsdale policy, which included Har-Mar’s operational expenses and had a $120,000 coverage limit. As to its operational-expenses claim, at trial Har-Mar presented evidence of rent it owed Hartung, the lessor, at the time of the fire and that it paid Hartung after the fire. But, as hereinafter noted, Hartung’s action against Har-Mar, i.e., the action that resulted in the Auto-Owners’ settlement, was by Har-Mar’s own admission an action seeking loss of rents. Thus, Har-Mar, having received compensation from Auto-Owners for its liability to Hartung for rent, nevertheless chose to introduce evidence at trial of rental obligations it owed Hartung in an effort to justify a recovery against Scottsdale. Having thus invited a potentially erroneous verdict, Har-Mar is not now in a position to complain about the trial court’s decision to set off the payment previously received from Auto-Owners against the amount awarded by the jury.
To be more specific, at trial Har-Mar presented testimony that it had a rent obligation to Hartung of $4,200 per month. Har-Mar also presented testimony that, when the fire occurred, Har-Mar owed Hartung “over $50,000.00 in rent” arrear-age. During the colloquy discussing the setoff, which occurred before the close of the evidence, Har-Mar conceded that Har-tung’s action against Har-Mar—the basis for Har-Mar’s recovery against Auto-Owners—was for loss of rents: “What Hartung sued Har-Mar for was lost rents. You did something that caused us to lose rent. We were getting rent, $4,200 a month, on our buildings. And now because of you setting the buildings on fire, we don’t get any more rent.”[12]
Nevertheless, during its case-in-chief, Har-Mar presented testimony that part of its claim against Scottsdale was for operating expenses, including rent payments:
“Q: ... In addition to rent, utilities, payroll and other recurring expenses of the business, can you tell the jury approximately how much that would have been?
“A. [Wayne Hartung:] I know that there was a breakdown of the—what they were calling business interruption. “Q. Okay.
“A. Uh, and I know that that capped at 120. And Scottsdale had their own forensic firm that did that, and it far exceeded 120—
“Q. Okay.
“A.—because the amount of time we were shut down.”
Har-Mar likewise presented testimony that it continued to make rent payments to Hartung after the fire. But it is not possible from the record to discern the total amount of rent Har-Mar claimed as operating expenses or whether such rents were attributable to past-due rent or rent paid after the fire, or what the amounts of the *913 other operating expenses that Har-Mar claimed were.[13] The record merely contains substantial evidence that the total operating expenses Har-Mar claimed as business-income losses under the Scottsdale policy, including rent, exceeded Scottsdale’s policy limits of $120,000.
After Har-Mar presented its case-in-chief, the trial court entertained arguments as to the issue of setoff, which the parties had agreed would not be discussed with the jury. At one point during the parties’ rather confusing arguments as to whether setoff was proper, the trial court stated to Har-Mar’s counsel: “Well, it would certainly be easier if there was more clarity in your damages claims than there really was at trial. I can tell you that. I hadn’t even thought about the issue of the offset being different.” Thereafter, the trial court indicated that it would allow a setoff as to the Auto-Owners’ settlement payment.
Upon resumption of the trial, Scottsdale and the other defendants rested their case without submitting any evidence beyond that offered during Har-Mar’s case-in-chief. Har-Mar then requested that it be allowed to offer “rebuttal” evidence, but the trial court denied that request. Har-Mar did not make a proffer as to what the “rebuttal” evidence might concern. Further, Har-Mar, with knowledge that the trial court would apply a setoff as to the Auto-Owners’ settlement and that Har Mar had submitted evidence as to rent expenses as to which the setoff would be applicable, did not request a special verdict or general verdict accompanied by answers to interrogatories as to damages. See Rule 49(b) and (c), Ala. R. Civ. P.
As noted, the jury returned a verdict awarding Har-Mar $101,054.40 against Scottsdale under the Scottsdale policy. The postverdict colloquy includes the following:
“THE COURT: ... The verdict would be adjusted to zero based on the amount of the offset; so—
“[Counsel for Har-Mar]: Judge, that’s not correct. That money was paid to a different corporation. As Ms. Clement has pointed out, these were all separate corporations. There was only $5,000 of that allotted to Har-Mar Collisions, Inc. and that was for a different coverage. It’s not for the same damages. That’s why there were two policies.
“THE COURT: Okay. That’s why I think I previously indicated that was my belief and that’s what I was going to rule; so I am going to stay consistent with what I had previously said; so I am going to offset the whole amount of the prior pro tanto with Auto-Owners and that will effectively reduce this verdict to zero.”
Based on the foregoing, I conclude that the trial court correctly applied a setoff. Based on Har-Mar’s own actions, the jury was presented with evidence as to damages that were duplicative of the loss-of-rents settlement previously paid by Auto-Owners. After the trial court informed Har-Mar that it would allow a setoff, Har-Mar was fully capable of protecting its interests by requesting a special verdict or a general verdict accompanied by answers to interrogatories as to damages, which it failed to do. Instead, Har-Mar invited *914 error as to the lack of specificity as to its damages claim, and that error has left us unable to determine as a matter of law that the jury award was for damages that were not subject to setoff. Cf. CNH Am., LLC v. Ligon Capital, LLC, 160 So.3d 1195, 1204 (Ala.2013) (“[Fjollowing the close of evidence, CNH submitted a proposed verdict form that again treated Li-gon’s and HTI’s individual fraudulent-suppression claims as a single collective claim. It was not until after the verdict was returned and a judgment entered thereon that CNH argued for the first time, in its postjudgment motion, that Ligón had a separate fraudulent-suppression claim, the elements of which were not proven even if HTI proved the elements of its own separate claim”). The lack of clarity in the record as to the nature of the damages sought by Har-Mar and in turn awarded by the jury inures, at least in this case, to Har-Mar’s detriment.
I also note that the trial judge, who heard all the evidence at trial and received argument as to the nature of the payment by Auto-Owners, concluded that a setoff was appropriate. He did not explain his reasons. In the absence of an indication in the record otherwise, where the trial court fails to make specific factual findings or to explain the legal rationale for its ruling, and yet there is sufficient evidentiary support for factual findings that would support its judgment and a proper legal theory upon which such findings will yield the judgment entered, we will assume the court made such findings and that it applied the correct legal principles thereto in reaching its judgment. See, e.g., Merchants Bank v. Head, 161 So.3d 1151, 1154 (Ala.2014); Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992); see also Clark v. Albertville Nursing Home, Inc., 545 So.2d 9, 13 (Ala.1989) (“The trial court’s judgment in such a case will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.”).
Further still, it is up to the appellant to make a record that will support his or her appeal. If Har-Mar had a problem with setoff, it should have sought to establish at trial or in its postjudgment motion, based on evidence presented to the jury, why the $101,054.40 could not be attributed to the same loss for which the Auto-Owners’ settlement had been paid. See Zaden v. Elkus, 881 So.2d 993, 1008 (Ala.2003) (“The party seeking to place the trial court in error must establish in the record an adequate predicate for our review.”).[14]
In sum, Har-Mar makes general assertions on appeal that it suffered damage in excess of the policy limits under the Scottsdale policy and that it has not been “made whole.” Har-Mar, however, directs us to no part of the record that establishes the specific breakdown of the $101,054.40 verdict against Scottsdale or on what basis we can determine how much of that verdict cannot be attributed to losses covered by the payment made by Auto-Owners. Accordingly, Har-Mar has not shown enough to warrant a reversal of the trial court’s judgment.

. Indeed, for all that appears, the disallowance of the setoff in Williams might be explained simply on the ground that the value of the insured’s total loss was an amount equal to or greater than the combined amounts paid by the insurance company and the third-party tortfeasor. If this is correct, it would explain why First Federal agreed to settle at a cost of only approximately $46,000 and to waive any right to receive any part of the insurance proceeds. For reasons discussed hereinafter, I do not agree.

. The main opinion premises its holding on its conclusions that the loss insured by Scottsdale and the loss insured by Auto-Owners are not the same loss. I do not agree. See discussion, infra.

. According to testimony of Wayne Hartung, which Har-Mar presented at trial, the rental agreement between Har-Mar and Hartung initially was required by Hartung's mortgagee, which "wanted a lease showing that even though I owned both companies, one company was going to pay the other rent so that Hartung ... would in fact have an income, at least enough to pay the mortgage note.” Thus, it is clear that the "rent” payments were simply a disguised way of protecting the mortgagee’s interests. And, as the main opinion notes, Scottsdale paid off the mortgage after the fire. In light of the nature of the relations between the single-owner entities at issue, Har-Mar and Hartung, it is questionable whether any past-due rents or post-fire rents could even legitimately be said to be owing by Har-Mar.

. The testimony presented by Har-Mar as to the operating expenses is merely general in nature. For example: "We had vendors. I think we had $30,000 being billed to us from Sherwin Williams, the paint automotive supplier”; "we started getting hit with the power bill, the gas bill, you know, mortgage notes, insurance, an array of expenses, and we kept payroll going for several months as we were working with the insurance company on this claim.”

. Likewise, had the trial court ruled against Scottsdale as to the issue of setoff, it would be in the same position as Har-Mar, i.e., Scottsdale would have been required to take actions such that it could establish both to the trial court and on appeal that the verdict actually included an award for damages already paid Har-Mar by Auto-Owners.